727 F.2d 786
 13 Fed. R. Evid. Serv. 365, 14 Fed. R. Evid.
Serv. 1362
UNITED STATES of America, Plaintiff-Appellee,
v.
Manuel Frank RUBIO, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Ronald Harrison ELLEDGE, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Donald Duane SMITH, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
John PALOMAR, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Alan David PASSARO, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Bert Samuel STEFANSON, Defendant-Appellant.
 Nos. 80-1577, 80-1584, 80-1586, 80-1587, 80-1592 and 80-1631.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted July 13, 1981.
Decided April 14, 1983.
Order Dec. 20, 1983.
Modified Feb. 29, 1984.
 
 Sanford Svetcov, Robert Mueller, III, Asst. U.S. Attys., San Francisco, Cal., for the U.S.
 Richard B. Mazer, San Francisco, Cal., for Rubio.
 Arlene West, Oakland, Cal., for Elledge.
 Du Bois & Hove, Richard E. Hove, Oakland, Cal., for Smith.
 Judd Iversen, San Francisco, Cal., for Palomar.
 Robert Carey, Palo Alto, Cal., for Passaro.
 Ray Archuleta, San Francisco, Cal., for Stefanson.
 Appeal from the United States District Court for the Northern District of California.
 Before ANDERSON and POOLE, Circuit Judges, and TAKASUGI,* District Judge.
 J. BLAINE ANDERSON, Circuit Judge:
 
 ORDER
 
 1
 A majority of the panel in the above case has voted to deny the petition for rehearing and to reject the en banc suggestion. Judge Poole would grant rehearing and accept the en banc suggestion.
 
 
 2
 The opinion and dissent filed herein on April 14, 1983 are withdrawn and the attached Opinion on Denial of Petition for Rehearing and the Dissent are substituted therefor.
 
 
 3
 The full court has been advised of the suggestion for en banc rehearing, and no judge of the court has requested a vote on the suggestion for rehearing en banc. Fed.R.App.P. 35(b).
 
 
 4
 The petition for rehearing is denied and the suggestion for a rehearing en banc is rejected.
 
 OPINION ON DENIAL OF PETITION FOR REHEARING
 
 5
 Rubio appeals his conviction of violating the Racketeer Influenced and Corrupt Organizations Act (RICO). 18 U.S.C. Secs. 1961-68. Elledge, Smith, Palomar, Passaro, and Stefanson appeal their convictions of various firearms and narcotics violations. The six cases were consolidated for trial and appeal.
 
 
 6
 The essential facts are not in dispute. On June 13, 1979, a grand jury returned a three-count indictment charging some thirty-three defendants with various violations of the RICO statute. All six defendants in the present case were charged with Count I of conspiring to participate in the conduct of the affairs of the Hell's Angels Motorcycle Club (hereinafter "Club"), an enterprise, through a pattern of racketeering activity in violation of 18 U.S.C. Sec. 1962(d). Count II charged Elledge, Passaro, Rubio, and Smith with having actually participated in the conduct of the affairs of the Club through a pattern of racketeering activity as proscribed by 18 U.S.C. Sec. 1962(c). Count III charged Rubio and Passaro with having conspired to use or invest a part of the income or proceeds of income derived from a pattern of racketeering activity in the operation of the San Rafael Auto Body & Repair Shop, an enterprise, in violation of 18 U.S.C. Sec. 1962(d) and (a).
 
 
 7
 On the evening of June 13, 1979, a task force of FBI, ATF, and DEA agents executed a carefully prepared plan for the arrest of all unincarcerated defendants named in the indictment and for the search of the residences of all the indicted defendants. The arrests and searches were executed pursuant to three warrants issued earlier that day by a federal magistrate. Where relevant, Prescott[1] search warrants and arrest warrants were issued. The other search warrants, hereinafter referred to as "indicia warrants," authorized the search for, and seizure of, "indicia of membership in or association with the Hell's Angels." A separate, but similar, affidavit was submitted in support of each indicia warrant.
 
 
 8
 In addition to evidence of membership or association, the execution of the indicia warrants resulted in the seizure of substantial amounts of evidence of criminal activity not covered by the indictment. Those seizures were purportedly made in reliance on the plain view doctrine. On July 25, 1979, a superseding indictment was filed charging additional criminal violations supported by the evidence so discovered. With the exception of Rubio, all defendants were convicted only on charges added by the superseding indictment. Rubio was convicted under the original indictment of conspiracy to invest funds derived from a pattern of racketeering activity in an enterprise, the San Rafael Auto Body & Repair Shop. Thus, while the justification for the indicia warrants rested upon the RICO charges in Counts I and II of the original indictment, the warrants' execution supplied the evidence to support the convictions of all defendants, except Rubio, on different charges. Similarly, though Rubio was convicted on a charge for which he was initially indicted, much of the evidence introduced on that charge was obtained through the indicia warrant.
 
 
 9
 All defendants except Smith join in the argument that evidence obtained in execution of the indicia warrants should have been suppressed because the warrants were invalid. Because we hold the warrants lacked probable cause,[2] we reverse the convictions of Rubio, Elledge, Palomar, Passaro, and Stefanson. We remand those cases to the trial court for possible reprosecution, however, because we are not advised whether sufficient evidence to support the convictions may exist apart from the tainted evidence. Because the Smith search was performed pursuant to a valid consent, we affirm Smith's conviction.
 
 I. Freedom of Association
 
 10
 Defendants initially contend that the search warrants, drawn as they were to authorize the search and seizure of "indicia of membership in or association with the Hell's Angels Motorcycle Club," were facially invalid as violative of the Club members' First Amendment guarantee of free association. The thrust of defendants' argument is that by authorizing the search for items containing the identities of Hell's Angels associates other than those indicted, the warrants violated the right to "privacy in one's associations" recognized in NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), and Bates v. City of Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960).
 
 
 11
 We agree with defendants that the First Amendment protects their right to associate with one another and with the Hell's Angels Motorcycle Club. We strongly disagree with any inference that criminal investigation is somehow prohibited when it interferes with such First Amendment interests. When activity protected by the First Amendment becomes the subject of a criminal investigation, the protections afforded by the Fourth Amendment come into play. As the Supreme Court said in upholding the search of a newspaper office in Zurcher v. Stanford Daily, 436 U.S. 547, 565, 98 S.Ct. 1970, 1981, 56 L.Ed.2d 525, 541-42 (1978):
 
 
 12
 "the ... cases do no more than insist that the courts apply the warrant requirements with particular exactitude when First Amendment interests would be endangered by the search .... Properly administered, the preconditions for a warrant--probable cause, specificity with respect to the place to be searched and the things to be seized, and overall reasonableness--should afford sufficient protection against the harms that are assertedly threatened ...."
 
 
 13
 Similar principles come into play in conspiracy cases, where agreement between the alleged conspirators must be proved. This court has held that items whose content is protected by the First Amendment may nevertheless be the proper subject of a search when those items tend to prove conspirators' associations with each other. United States v. Giese, 597 F.2d 1170, 1187 (9th Cir.) (on denial of rehearing en banc), cert. denied, 444 U.S. 979, 100 S.Ct. 480, 62 L.Ed.2d 405 (1979).
 
 
 14
 Under 18 U.S.C. Sec. 1962(c), Congress has made association with an enterprise one element of the RICO offense. See United States v. Turkette, 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246, 254 (1981). That element has withstood the attack that it unconstitutionally punishes associational status, the courts recognizing that RICO's "proscriptions are directed against conduct, not status." United States v. Martino, 648 F.2d 367, 380 (5th Cir.1981), cert. denied, 456 U.S. 943, 949, 102 S.Ct. 2006, 2007, 2020, 72 L.Ed.2d 465, 474 (1982) (quoting United States v. Elliott, 571 F.2d 880, 903 (5th Cir.), cert. denied, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978)). Ofttimes, evidence of the associational element of RICO can be obtained only through a search of the suspect's property. It would be anomalous indeed if the associational element of RICO were to remain forever unsatisfied on the basis that an otherwise constitutional search warrant could never issue because it would violate the RICO suspect's First Amendment right to free association.
 
 
 15
 We recognize the potential for abuse that these indicia warrants can present. In this portion of the opinion, we conclude only that a narrowly drawn, and properly issued and executed warrant which authorizes the search for indicia of membership or association with a particular enterprise, does not violate the RICO suspect's right to freedom of association.
 
 II. Probable Cause
 
 16
 Defendants challenge the issuance of the warrants as lacking probable cause. Specifically, defendants contend the warrants lack probable cause because no nexus was established between the indicia of association seized and the alleged criminal activity. We agree.
 
 
 17
 Certain classes of evidence--fruits and instrumentalities of crime, and contraband--have always been constitutionally subject to seizure if they were sufficiently described in a search warrant issued with probable cause. Prior to 1967, however, a doctrine known as the "mere evidence" rule prevented the seizure of items whose sole interest to the government was their introduction at trial to prove the government's case. Gouled v. United States, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647 (1921). The Supreme Court overturned the mere evidence rule in Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). In Warden, police officers seized clothing belonging to an armed robbery suspect from a washing machine in the suspect's home. The clothing was introduced at trial and the defendant was convicted based on an eyewitness identification of each item. The Supreme Court held that although the clothing was mere evidence according to the traditional Gouled standard, its seizure was constitutional.
 
 
 18
 The Warden Court noted that Gouled had been based largely on common law property notions rather than on the Fourth Amendment's guarantee of privacy. "We have recognized that the principal object of the Fourth Amendment is the protection of privacy rather than property, and have increasingly discarded fictional and procedural barriers rested on property concepts." Id. at 304, 87 S.Ct. at 1648, 18 L.Ed.2d at 790. The Court then reasoned that "[t]he requirements of the Fourth Amendment can secure the same protection of privacy whether the search is for 'mere evidence' or for fruits, instrumentalities or contraband." Id. at 306-07, 87 S.Ct. at 1649-50, 18 L.Ed.2d at 792.
 
 
 19
 In order to effectuate the Fourth Amendment's privacy guarantee, the Warden Court required that "[t]here must, of course, be a nexus--automatically provided in the case of fruits, instrumentalities or contraband--between the item to be seized and criminal behavior. Thus, in the case of 'mere evidence,' probable cause must be examined in terms of cause to believe that the evidence sought will aid in a particular apprehension or conviction." Id. After Warden, the Federal Rules of Criminal Procedure were modified to authorize the issuance of a warrant to search for items of solely evidential value. Fed.R.Crim.P. 41(b). See also 18 U.S.C. Sec. 3103a (a warrant may be issued to search for and seize any property that constitutes evidence of a criminal offense).
 
 
 20
 In the present case, virtually all of the items described in the search warrants were "mere evidence." Therefore, in addition to examining the warrants for probable cause to believe the evidence sought would be found in the places described in the warrants, see United States v. Flores, 679 F.2d 173, 175 (9th Cir.1982), we must also examine the warrants for probable cause to believe there was a connection between the evidence sought and a violation of the RICO statute.
 
 
 21
 When the government suspects criminal activity, the nature of which is a RICO violation, any evidence relevant to prove any element of the RICO offense is potentially seizable. The search warrants in the present case were tailored around the elements of 18 U.S.C. Sec. 1962(c), under which it is unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." Under Sec. 1962(c), evidence of association would be subject to seizure, as would evidence of the existence of the enterprise and evidence of the pattern of racketeering activity. However, none of this evidence would be seizable under the Fourth Amendment except upon a showing of probable cause to believe it was somehow connected to criminal activity.
 
 
 22
 The trial judge concluded that because indicia of association would aid in a conviction under the RICO counts, a nexus existed between the items sought and the alleged criminal activity. Our standard of review over probable cause is currently a subject of major dispute. Recent decisions of this court would indicate that although we must pay substantial deference to the magistrate's determination, the ultimate issue of whether probable cause exists is a question of law over which we exercise de novo review. United States v. Chesher, 678 F.2d 1353, 1359 (9th Cir.1982). In its last term, however, the Supreme Court announced that, at least in the context of reviewing probable cause based on an anonymous informant's tip, "after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of de novo review." Illinois v. Gates, --- U.S. ----, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527 (1983). The Supreme Court in Gates applied a standard that would consider simply whether the magistrate had "a substantial basis" for his probable cause determination. --- U.S. at ----, 103 S.Ct. at 2332, 76 L.Ed.2d at 548-49. The case of United States v. McConney, No. 80-1012, is currently before this court en banc considering the issue. For purposes of this case, however, we are constrained to disagree with the trial court regardless of which standard applies.
 
 
 23
 If such a large portion of the subject organization's activities are illegitimate so that the enterprise could be considered, in effect, wholly illegitimate, then there would certainly be cause to believe that evidence of a suspect's association with that enterprise would aid in a RICO conviction. However, where there is no allegation that the enterprise is wholly illegitimate, as is true in this case, evidence of mere association would not necessarily aid in obtaining a conviction. Something more must be demonstrated; otherwise, the Fourth Amendment would offer little protection for those who are innocently associated with a legitimate enterprise, the affairs of which are being conducted by others through a pattern of racketeering activity. In this regard, we concur in the assessment of the Second Circuit in United States v. Scotto, 641 F.2d 47, 54 (2d Cir.1980), cert. denied, 452 U.S. 961, 101 S.Ct. 3109, 69 L.Ed.2d 971 (1981), that "simply committing predicate acts which are unrelated to the enterprise or one's position within it would be insufficient" to establish a violation of Sec. 1962(c). See also United States v. Brooklier, 685 F.2d 1208, 1216 (9th Cir.1982) ("The essence of a RICO conspiracy is not an agreement to commit racketeering acts, but an agreement to conduct or participate in the affairs of an enterprise through a pattern of racketeering."), cert. denied, --- U.S. ----, 103 S.Ct. 1194, 1195, 75 L.Ed.2d 439 (1983). Similarly, probable cause to believe a suspect was associated with a particular enterprise would be insufficient, of itself, to support a warrant for the seizure of indicia of association. Accordingly, we hold that in the absence of a showing that such a large portion of the RICO enterprise's activities are illegitimate so that the entire enterprise, in effect, becomes wholly illegitimate, the affidavit in support of a search warrant authorizing the seizure of indicia of membership or association must also provide probable cause to believe that the subject has conducted the affairs of the enterprise, at least in part, through a pattern of racketeering activity. We believe a contrary rule could lead to the seizure of "mere evidence" from any suspected member or associate of any enterprise with no nexus whatever between that evidence and criminal activity. Such a rule would offend the principle of Warden v. Hayden.
 
 
 24
 Examining the search warrants and their supporting affidavits in the present case, we must conclude that the warrants were issued without probable cause. All five affidavits are identical through paragraph 23, and contain voluminous detail about the indicia customarily kept by members and associates of the Hell's Angels Motorcycle Club. The remaining paragraphs state facts varying with each defendant, tending to establish that the defendant is a member or associate of the Club, and that the indicia of membership previously described would be found at the defendant's residence. Finally, each affidavit contains a paragraph stating that a federal grand jury has returned an indictment which charges the named defendant with associating with a RICO enterprise--the Hell's Angel Motorcycle Club--for a specified period of time.
 
 
 25
 None of the affidavits contain a statement of probable cause to believe that any defendant had conducted the affairs of the Club through a pattern of racketeering activity, nor do the affidavits contain facts tending to support such a statement. The facts in the affidavits are limited to the establishment of association with the enterprise. These facts are insufficient to provide the requisite nexus between the association of the defendants with the enterprise and some form of criminal activity.
 
 
 26
 Moreover, the affidavits' recitation of the RICO indictment is insufficient to establish probable cause. The warrants before us are substantially identical to those reviewed by this court in United States v. Chesher, 678 F.2d 1353 (9th Cir.1982). The search conducted in Chesher arose out of the same indictment involved in the present case and was a part of the same overall search and arrest plan executed by federal officers on June 13, 1979. In Chesher, we reviewed the affidavit and warrant for evidence of current membership or association with the Hell's Angels Motorcycle Club, and found that the RICO indictment provided none. Here, we review the affidavit and warrant for evidence of a nexus between criminal activity and association with the Club. Again, we find no such evidence in the affidavit's mere recitation of the indictment.
 
 
 27
 The function of the grand jury is to determine whether there is sufficient probable cause to require an accused to stand trial before a petit jury. United States v. Ellsworth, 647 F.2d at 957, 964 (9th Cir.1981), cert. denied, 456 U.S. 944, 102 S.Ct. 2008, 72 L.Ed.2d 465 (1982). Because that determination is so similar to the elements of probable cause for an arrest, an indictment " 'fair upon its face,' and returned by a 'properly constituted grand jury' conclusively determines the existence of probable cause and requires issuance of an arrest warrant without further inquiry." Gerstein v. Pugh, 420 U.S. 103, 117, 95 S.Ct. 854, 865 n. 19, 43 L.Ed.2d 54, 67 n. 19 (1975) (citing Ex parte United States, 287 U.S. 241, 250, 53 S.Ct. 129, 131, 77 L.Ed. 283, 287 (1932)). The same cannot be said for a search warrant. The Fourth Amendment requires that warrants may issue only upon a determination of probable cause by a "neutral and detached magistrate." Steagald v. United States, 451 U.S. 204, 212, 101 S.Ct. 1642, 1647-48, 68 L.Ed.2d 38, 46 (1981). The magistrate must be provided with sufficient facts from which he may draw the inferences and form the conclusions necessary to a determination of probable cause. Giordenello v. United States, 357 U.S. 480, 485-86, 78 S.Ct. 1245, 1249-50, 2 L.Ed.2d 1503, 1509 (1958). The facts upon which the magistrate bases his probable cause determination must appear within the four corners of the warrant affidavit; the warrant cannot be supported by outside information. United States v. Martinez, 588 F.2d 1227, 1234 (9th Cir.1978); United States v. Anderson, 453 F.2d 174 (9th Cir.1971). For these reasons, this court held in Ellsworth that an indictment alone cannot supply probable cause to search. Ellsworth, 647 F.2d at 964 ("A Grand Jury is not a court, and its spectrum of responsibility does not include the duty of determining probable cause or lack thereof to search, nor the making of a decision as to whether the search warrant should issue.").
 
 
 28
 Although Ellsworth allows the indictment to be considered along with other facts by a magistrate in determining probable cause, it is not, of itself, an adequate substitute for articulable facts in the warrant affidavit. As the Supreme Court reaffirmed in Illinois v. Gates, "[s]ufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others." --- U.S. at ----, 103 S.Ct. at 2332, 76 L.Ed.2d at 549. The warrant affidavit's mere recitation of the indictment is precisely that--the conclusion of another body, and a body whose function differs substantially from the magistrate's constitutional duty to assess probable cause. See United States v. DeFalco, 509 F.Supp. 127, 137-39 (S.D.Fla.1981) (observing that the grand jury's investigative role detracts from its neutrality). As we said in Chesher, if the government has evidence of criminal activity to present to the grand jury, there is nothing to prevent it from disclosing such evidence to the magistrate so that he can exercise independent judgment. United States v. Chesher, 678 F.2d at 1363 n. 9.
 
 
 29
 In the present case, the magistrate had no substantial basis for concluding that probable cause existed. As we discussed earlier, but for its reference to the indictment the affidavit furnished no basis whatsoever for believing the defendants had conducted the affairs of the Club through a pattern of racketeering activity. Thus, as contrasted to the affidavit in Ellsworth,[3] the magistrate's determination that probable cause existed was necessarily based on the indictment alone. Under Ellsworth, that is an impermissible basis.
 
 
 30
 The government argues that it alleged and had substantial proof that the Club was used as a vehicle to facilitate the conduct of racketeering activity. We search the affidavits and the record in vain, however, for any such proof. The record is replete with instances of individual criminal behavior by members and associates of the Club, but we find no connection between such individual activity and the conduct of the affairs of the enterprise as a whole. Because of the innocuous nature of the evidence seized (clothing, documents, photographs, etc.), the privacy interests that stand as the foundation of the Fourth Amendment are highly vulnerable here. The only protection for those interests when seizure of this type of evidence is sought is probable cause to support the search. After careful scrutiny of the affidavits supporting these indicia warrants, we conclude the probable cause requirement has not been satisfied. Accordingly, the evidence should have been suppressed.
 
 III. Smith Issues
 
 31
 Although Smith was named in the original June 13, 1979 RICO indictment, he was not a subject of the massive search and arrest plan described above because he had been previously arrested on state charges. Evidence seized concurrently with that arrest furnished the basis for Counts XVII and XVIII of the superseding federal indictment. Smith appeals from a conviction under 18 U.S.C. app. Sec. 1202(a)(1) (unlawful possession of firearm by convicted felon), with which he was charged under Count XVIII of the superseding indictment.
 
 
 32
 On April 6, 1979, a group of local, state, and federal officers, armed with a valid arrest warrant but no search warrant, went to Smith's reported address at 2717-77th Avenue, Oakland, California. At that address, the officers found two buildings a few yards apart on the same lot surrounded by a fence and sharing a common driveway. Only the front building bore address numbers.
 
 
 33
 When Smith could not be found in the front building, the officers proceeded to the building in back and knocked on the door. A known member of the Hell's Angels, Raymond Baker, answered, holding a gun cleaning rod in his hand. When the officer sought entrance to search for Smith, Baker replied, "Okay, but I only want one of you to come inside." A federal agent replied that the condition was "unacceptable," after which Baker unlocked the door and permitted the agents to enter, saying, "Don't get excited, I am cleaning my guns." The rear building later turned out to be a separate residence owned by Baker.[4]
 
 
 34
 Smith was found in a back bedroom and was arrested. The officers seized four firearms that were within Smith's immediate reach, and eighteen other firearms found in various parts of the house during the search for Smith. Smith was convicted for possession of the four firearms found near him during the arrest.
 
 A. Search and Seizure
 
 35
 Smith urges that the firearms were seized in violation of the Fourth Amendment because the officers conducted an invalid warrantless search. Specifically, Smith contends that although Baker consented to a search, the consent was qualified to the extent of allowing in only one officer, and the limits of that consent were exceeded when other officers entered.
 
 
 36
 A specific exception to the Fourth Amendment's warrant and probable cause requirements is that a search conducted pursuant to a valid consent is constitutionally permissible. Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854, 858 (1973)); United States v. Henry, 615 F.2d 1223, 1230 (9th Cir.1980). As owner and permanent resident of the house, Baker clearly had authority to consent to a search of its contents. United States v. Dubrofsky, 581 F.2d 208, 212 (9th Cir.1978).
 
 
 37
 Smith maintains, however, that Baker's consent was merely a qualified one and that the search exceeded the scope of the consent because more than one officer entered the house. While it is clear that the government must conform to limitations placed upon the right granted to search, Mason v. Pulliam, 557 F.2d 426, 428-29 (5th Cir.1977); United States v. Griffin, 530 F.2d 739, 744 (7th Cir.1976), Smith has cited no authority, and we have found none, in which a consent was qualified by the number of officers allowed to search, as opposed to the physical bounds of the area to which the consent was granted. See, e.g., United States v. Dichiarinte, 445 F.2d 126 (7th Cir.1971) (where defendant told police they could search his house for narcotics, police could not open and examine private papers found in the house).
 
 
 38
 We are unpersuaded that a consent search may be validly qualified by the number of officers allowed to search, and we so hold. Once consent has been obtained from one with authority to give it, any expectation of privacy has been lost. We seriously doubt that the entry of additional officers would further diminish the consenter's expectation of privacy, and, in the instant case, any remaining expectation of privacy was outweighed by the legitimate concern for the safety of a single officer conducting a search of a house known to contain firearms. Cf. United States v. White, 617 F.2d 1131, 1134 (5th Cir.1980) (motion to suppress denied because delay in search and search by agents not named in consent form were not related to the scope of the search).
 
 
 39
 Even if the limitation on the number of officers who could search was a valid qualification, the trial court found that by allowing entry of all the officers without protest, Baker had revoked his qualification. In United States v. Sierra-Hernandez, 581 F.2d 760 (9th Cir.), cert. denied, 439 U.S. 936, 99 S.Ct. 333, 58 L.Ed.2d 333 (1978), we held that the question of whether the scope of consent had been exceeded was a factual one, to be determined on the basis of the totality of the circumstances. Id. at 764. In this regard, the trial judge's finding will be upheld unless it is clearly erroneous, United States v. Lemon, 550 F.2d 467, 472 (9th Cir.1977); United States v. Page, 302 F.2d 81, 85 (9th Cir.1962) (en banc), and, on this record, we do not find such error. When the officers informed Baker of their refusal to accept his condition, Baker unlocked the door and permitted them all to enter without objection. These facts support the trial judge's conclusion that an unqualified consent to search was given.
 
 B. Stipulation to Prior Conviction
 
 40
 Early in this consolidated trial, the parties stipulated to Smith's 1977 conviction of the felony of possession for sale of methamphetamine. Approximately two months later, the government sought to introduce the testimony of a police officer concerning the events and circumstances surrounding the conviction, including the possession by Smith of a loaded firearm. The trial judge ruled the evidence admissible, concluding it was relevant to prove the RICO charges. Smith contends that the admission of such evidence was erroneous, to which the government responds that a stipulation to an accused's prior conviction does not preclude the later admission of facts underlying the conviction.
 
 
 41
 We agree with Smith that once a matter is stipulated, it is conclusively proven. United States v. Houston, 547 F.2d 104, 107 (9th Cir.1976); Schlemmer v. Provident Life & Accident Ins. Co., 349 F.2d 682, 684 (9th Cir.1965). It does not follow, however, that when the fact of a conviction is stipulated, the circumstances underlying the conviction are forever immune from inquiry.[5]
 
 
 42
 Under Fed.R.Evid. 404(b), evidence of other crimes, wrongs, or acts may be admissible to prove such elements as "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Smith was charged both with conspiracy to violate and substantive violations of the RICO statute. Those charges require proof of such elements as the existence of an enterprise, the association of the defendant with the enterprise, as well as the traditional requirements of a conspiracy. In addition, proof of the predicate acts required for establishing a pattern of racketeering activity under RICO is essential. See discussion infra, part C.
 
 
 43
 The district court's decision to admit evidence is reviewed for an abuse of discretion. United States v. Cox, 633 F.2d 871, 874 (9th Cir.1980), cert. denied, 454 U.S. 844, 102 S.Ct. 159, 70 L.Ed.2d 130 (1981). Given the broad elements of the offenses with which Smith was charged, we cannot say the trial judge abused his discretion in finding that the circumstances surrounding Smith's 1977 drug conviction were relevant to prove those charges.
 
 C. Admission of Eighteen Firearms
 
 44
 Smith was convicted on Count XVIII--illegal possession of firearms--based on the four guns found within his reach at the time of his arrest. Smith asserts that the prejudicial effect of the admission into evidence of eighteen other firearms found within the house outweighed the probative value of the evidence, constituting prejudicial error under Fed.R.Evid. 403. We disagree.
 
 
 45
 This court will review a trial judge's decision regarding the admission or exclusion of evidence under Rule 403 for abuse of discretion. United States v. Watkins, 600 F.2d 201, 204 (9th Cir.), cert. denied, 444 U.S. 871, 100 S.Ct. 148, 62 L.Ed.2d 96 (1979). On the record before us, we do not find such an abuse. The firearms were relevant under Rule 404(b) as proof of the predicate acts required for establishing a pattern of racketeering activity under RICO. One of those predicate acts is "dealing in narcotic or other dangerous drugs." 18 U.S.C. Sec. 1961(1)(A). In United States v. Martin, 599 F.2d 880, 889 (9th Cir.), cert. denied, 441 U.S. 962, 99 S.Ct. 2407, 60 L.Ed.2d 1067 (1979), we held that firearms may be relevant to show an accused's involvement in the narcotics trade.
 
 
 46
 In any event, it is more probable than not that the admission of the eighteen firearms did not materially affect the verdict. See United States v. Valle-Valdez, 554 F.2d 911 (9th Cir.1977) (adopting the more-probable-than-not standard of determining harmlessness of nonconstitutional error); Fed.R.Evid. 103(a) ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected"); Fed.R.Crim.P. 52(a) ("Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."). The firearms were admitted as evidence on the RICO counts, yet Smith was not convicted on those counts. We conclude that the prejudice resulting from the admission of this evidence, if any, was minimal.
 
 
 47
 D. Reinstatement of Previously Dismissed Indictment
 
 
 48
 On August 7, 1980, after the jury had returned a guilty verdict on the gun possession count against Smith and a mistrial was declared as to the other three counts, the government moved "for leave to dismiss the indictment." The district court granted the motion, dismissing all four counts. Three days later, the government, upon realizing that all four counts had been dismissed, moved the court to vacate its prior order and to issue a new order dismissing all counts except the firearms count on which Smith had been convicted. The district court granted the motion and modified its order, reinstating Count XVIII.
 
 
 49
 Smith objected to sentencing on the grounds that the district court lost jurisdiction to reinstate the indictment when it dismissed all counts. The government responds that dismissal was based on an inadvertent mistake, in that its intent was to dismiss only those counts upon which a conviction had not been obtained. We hold that the district court had jurisdiction to reinstate the indictment and that it did not abuse its discretion in doing so.
 
 
 50
 We note that the Federal Rules of Criminal Procedure contain no counterpart to Fed.R.Civ.P. 60(b), which provides for relief from final judgments, orders, and other proceedings for, among other reasons, "mistake, inadvertence, surprise, or excusable neglect." The Supreme Court, however, has recognized that "[e]very court must be presumed to exercise those powers belonging to it which are necessary for the promotion of public justice; and we do not doubt that this court possesses the power to re-instate any cause dismissed by mistake." The Palmyra, 25 U.S. (12 Wheat.) 1, 10, 6 L.Ed. 531, 534 (1827).
 
 
 51
 Most early courts arbitrarily held the reinstatement of a mistakenly dismissed indictment to be a proper exercise of their inherent jurisdiction to correct errors only if it was done during the same term at which the dismissal was entered. E.g., United States v. Rossi, 39 F.2d 432, 433 (9th Cir.1930); Annot., 112 A.L.R. 386 (1938). More recently, this court has reviewed district courts' correction of erroneous orders by treating them as responses to motions for reconsideration, which are timely presented if "filed within the original period for review." United States v. Jones, 608 F.2d 386, 390 (9th Cir.1979) (quoting United States v. Healy, 376 U.S. 75, 78, 84 S.Ct. 553, 555, 11 L.Ed.2d 527, 531 (1964)). Accord United States v. Emens, 565 F.2d 1142, 1144-45 (9th Cir.1977).
 
 
 52
 In Emens, this court applied the foregoing principles to hold that a district court, during the time for appeal, holds jurisdiction to vacate its previous pretrial order dismissing an indictment. United States v. Emens, at 1145. Our decision in Emens is dispositive of this issue. As we said there, "the finality of the order of the District Court dismissing the indictment was stayed by the timely filing of a petition for rehearing, [and] a fortiori such order was stayed pending resolution of the petition." Id. Although we are presented here with a post-trial dismissal and reinstatement of an indictment, we discern, on these facts,[6] no basis in reason or justice for distinguishing Emens. We cannot conceive that Congress intended, by failing to provide a criminal counterpart to Fed.R.Civ.P. 60(b), to strip a court of its inherent jurisdiction to vacate or modify an order inadvertently made through mistake in a criminal proceeding. This is a matter within the trial judge's discretion, subject only to review by this court for abuse thereof, and we are of the opinion that on the showing made before him, the trial judge properly reinstated the indictment.
 
 E. Failure to Discharge Alternate Jurors
 
 53
 Smith's final contention is that the district court erred in deciding to retain the alternate jurors after the jury retired to consider its verdict. See Fed.R.Crim.P. 24(c). Because Smith failed to preserve this issue through a timely objection below, we may review it only if it constitutes plain error. United States v. Perez, 491 F.2d 167, 173 (9th Cir.), cert. denied, 419 U.S. 858, 95 S.Ct. 106, 42 L.Ed.2d 92 (1974). We conclude that Smith has failed to establish the kind of "highly prejudicial error affecting substantial rights" required for plain error review. United States v. Giese, 597 F.2d 1170, 1199 (9th Cir.), cert. denied, 444 U.S. 979, 100 S.Ct. 480, 62 L.Ed.2d 405 (1979). The alternate jurors were properly sequestered in a separate hotel from the regular jurors, separate marshals were sworn and assigned to the regular and alternate jurors, and there was no contact whatever between the regular jurors and the alternates. On these facts, the trial judge's failure to discharge the alternates under Rule 24(c), if prejudicial at all,[7] was certainly not plain error.
 
 
 54
 Having concluded that none of Smith's claims are meritorious, we AFFIRM his conviction. No. 80-1586.
 
 
 55
 We REVERSE the convictions of Rubio, Elledge, Palomar, Passaro, and Stefanson. Nos. 80-1577, 80-1584, 80-1587, 80-1592, and 80-1631. The government will file notice with the district court within 30 days if it intends to reprosecute.
 
 
 56
 The motion of the appellee, United States of America, to stay issuance of the mandate pursuant to Rule 41(b) for a period of 30 days pending application for a writ of certiorari is GRANTED.
 
 
 57
 POOLE, Circuit Judge, concurring in part and dissenting in part on denial of petition for rehearing.
 
 
 58
 I respectfully dissent from the majority's reversal of the convictions in this case and its application of rigid and unsound propositions of law which produced that reversal. The majority has held that evidence obtained by the Government pursuant to "indicia" search warrants was obtained without probable cause because the affidavits did not allege that the underlying offense--association with an unlawful RICO enterprise and participation in the conduct of its affairs through a pattern of racketeering--was "wholly" illegal.
 
 
 59
 The magistrate, applying a straight-forward common sense analysis, found probable cause. The majority, after making a "de novo" review pursuant to principles stemming from Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), found absence of probable cause to search. That to me seems a denial of the deference which is due to the magistrate's finding as required by Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). It also misreads, or ignores, the directions given only a few months ago in Illinois v. Gates, --- U.S. ----, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).
 
 
 60
 I disagree with these conclusions reached by the majority: (1) that in a RICO case which charges the defendants with association with an enterprise and participating in the conduct of its affairs through a pattern of racketeering, a warrant cannot issue to search out indicia of the basic association unless the affidavits allege that the enterprise is "wholly" illegal; (2) that a magistrate's finding of probable cause in such a case is subject to "de novo" review by the courts of appeals; and (3) that the indicia search warrants in this case were lacking in probable cause because they showed no "nexus" to the crime and that nexus could not be supplied by notice of contemporaneous indictment of the Grand Jury.
 
 
 61
 In Gates, the United States Supreme Court has clearly told us that "after the fact scrutiny by courts of the sufficiency of an affidavit [for search warrants] should not take the form of de novo review," 103 S.Ct. at 2331; and that the magistrate's task:
 
 
 62
 is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.
 
 
 63
 103 S.Ct. at 2332.
 
 
 64
 The majority has given scant heed to this ruling in setting aside the warrants, verdicts and judgments of this long and difficult trial.
 
 DISCUSSION
 
 65
 In Gates, Justice Rehnquist wrote that "[t]he strictures that inevitably accompany the 'two-pronged test' [of Spinelli] cannot avoid seriously impeding the task of law enforcement, * * * " Gates, 103 S.Ct. at 2331. The Gates court applied a "totality of circumstances" test in place of the stricter "two-prong" analysis which had prevailed for many years, and the Court held that the Spinelli approach, which had come to be treated as untouchable ritual. Probable cause must still be shown, but that conclusion is properly drawn from the whole picture. The Constitution only requires reasoned judgment, supported by facts which will answer
 
 
 66
 "the commonsense, practical question whether there is 'probable cause' to believe that contraband or evidence is located in a particular place."103 S.Ct. at 2328. The court held that only within the limits of that inquiry should the magistrate's conclusion be reviewed.
 
 
 67
 For those so long accustomed to traditional views and reviews of probable cause, Gates' new approach may not sit too well. Such persons may, as has the majority, prefer to stake out a different ground. The majority suggests that the standard of review set forth in Gates is not really applicable except in the context of reviewing probable cause where it is based on an anonymous informant's tip. Majority Op. at 793. But the decision is not so narrow. Without further discussion, the majority has announced and implemented its determination to continue applying what is transparently still a de novo review of probable cause findings.
 
 
 68
 But Illinois v. Gates has held that we should not do that:
 
 
 69
 * * * We conclude that it is wiser to abandon the "two-pronged test" established by our decisions in Aguilar and Spinelli. In its place we reaffirm the totality of the circumstances analysis that traditionally has informed probable cause determinations. [Citations omitted]. The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for ... conclud[ing]" that probable cause existed. [Citation omitted]. We are convinced that this flexible, easily applied standard will better achieve the accommodation of public and private interests that the Fourth Amendment requires than does the approach that has developed from Aguilar and Spinelli.
 
 
 70
 Gates, 103 S.Ct. at 2332.
 
 
 71
 Instead of applying the nontechnical approach set forth above, the majority has in fact created its own additional technicality which, if allowed to stand, will continue to complicate the task of preparing such warrants which are often issued "on the basis of nontechnical, common-sense judgments of laymen applying a standard less demanding than those used in more formal legal proceedings." Id., 103 S.Ct. at 2330-2331.
 
 
 72
 The majority seems to proceed as if a RICO case is constitutionally suspect. It holds that it is not enough that the "totality of circumstances" justify the magistrate's common-sense decision that there is a "fair probability" that what is sought "will be found in a particular place." Instead it insists that the affidavit must independently show probable cause that the "subject has conducted the affairs of the enterprise, at least in part, through a pattern of racketeering activity." Majority Op. at 794. Support for this conclusion is claimed to arise from Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), a decision which actually disapproved earlier doctrine to the effect that a warrant could not issue to search for "mere evidence." I do not believe Warden comes close to justifying what the majority has done here.
 
 
 73
 In Warden, a man of Hayden's description, wearing a cap, and fleeing from a robbery, was seen entering a house occupied by Hayden's mother. About five minutes later, under what the Supreme Court termed "the exigencies of the situation," but without warrant, the police entered the house looking for him. The mother "offered no objection" to their request to search the house. Hayden was found feigning sleep. In the meanwhile, another officer, presumably still looking for the suspect, heard running water in an adjoining bathroom. He looked in and found weapons. Still another officer, searching the cellar, found clothing similar to that worn by the robber. Also, ammunition, a shotgun and the cap were found under the mattress in Hayden's room. At Hayden's trial for robbery in state court, all the evidence was admitted and he was convicted.
 
 
 74
 Hayden's petition for habeas corpus was dismissed by the district court. There was little dispute as to the propriety of the seizure of weapons, but the issue was whether introduction of "mere evidence"--clothing--was proper under Gouled v. United States, 255 U.S. 298, 309, 41 S.Ct. 261, 265, 65 L.Ed. 647 (1921), which had held to the contrary. The Court of Appeals for the Fourth Circuit had felt bound by Gouled and so reversed the district court. The Supreme Court granted certiorari.
 
 
 75
 The Supreme Court reversed the Court of Appeals (the Chief Justice and Justices Douglas and Fortas dissenting), holding that the Fourth Amendment did not distinguish "mere evidence" from tangible evidence. Justice Brennan, for the majority, explained that a major concern of the Amendment is to protect against invasion of the privacy of the person, and of his home, papers, and effects, unless there existed proper reason (probable cause) for doing so. Therefore, in a criminal case, the justification for search must appear; there must be a connection or "nexus" between the item to be seized and criminal behavior:
 
 
 76
 The requirements of the Fourth Amendment can secure the same protection of privacy whether the search is for "mere evidence" or for fruits, instrumentalities or contraband. There must, of course, be a nexus--automatically provided in the case of fruits, instrumentalities or contraband--between the item to be seized and criminal behavior. Thus in the case of "mere evidence," probable cause must be examined in terms of cause to believe that the evidence sought will aid in a particular apprehension or conviction. In so doing, consideration of police purposes will be required. * * * But no such problem is presented in this case. The clothes found in the washing machine matched the description of those worn by the robber and the police therefore could reasonably believe that the items would aid in the identification of the culprit.
 
 
 77
 Id. 387 U.S. at 307, 87 S.Ct. at 1650 (Citation omitted) (Emphasis supplied).
 
 
 78
 There is nothing esoteric or abstruse about "nexus"--it simply means a tie or link; and the link is to an official proceeding important enough to justify a warrant's invasion of privacy, almost always reserved for criminal proceedings. The search must contemporaneously be shown to be "linked" to that justification--that it is related to a charge of wrongdoing. The "nexus" in Warden was supplied by the common-sense conclusion of the policeman who came across the clothing that "the items would aid in the identification of the culprit." Nothing in Warden compels or even suggests what the magistrate should do other than reach a common-sense conclusion on the facts and decide whether they demonstrate a rational connection (i.e., linkage) between the offenses involved and the evidence sought, the probability that items such as those sought would aid in connecting the suspect with the commission of that offense (or in his conviction), and a reasonable likelihood that the items will be found in the places described.
 
 
 79
 In the RICO statute, 18 U.S.C. Sec. 1962(c), Congress made it a criminal offense for one knowingly to be "associated with any enterprise," as that term is defined. The statute has been upheld even though it undoubtedly impinges upon associational freedoms. See United States v. Martino, 648 F.2d 367, 380 (5th Cir.1981), cert. denied, 456 U.S. 949, 102 S.Ct. 2020, 72 L.Ed.2d 474 (1982) (quoting United States v. Elliott, 571 F.2d 880, 903 (5th Cir.) cert. denied, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978)). The majority does not claim that "a narrowly drawn, and properly issued and executed [indicia] warrant * * * violates a RICO suspect's right to freedom of association." Majority Op. at 792. And the majority seems to concede that affidavits for the search warrants in these cases would have been sufficient if they sought only the fruits, instrumentalities, or even "mere" evidence of crime. But it insists on imposing burdens on warrants seeking indicia evidence even though it may tend directly to prove the "association" component of the crime of carrying on the RICO enterprise. The majority obviously distrusts "mere evidence" although logically "mere" and "tangible" evidence may equally prove the forbidden conduct denounced by the RICO statute. The majority holds that
 
 
 80
 where there is no allegation that the enterprise is wholly illegitimate, as is true in this case, evidence of mere association would not necessarily aid in obtaining a conviction. Something more must be demonstrated; otherwise, the Fourth Amendment would offer little protection for those who are innocently associated with a legitimate enterprise, the affairs of which are being conducted by others through a pattern of racketeering activity.
 
 
 81
 Majority Op. at 793. Specifically, the majority tell us that
 
 
 82
 in the absence of a showing that such a large portion of the RICO enterprise's activities are illegitimate so that the entire enterprise, in effect, becomes wholly illegitimate, the affidavit in support of a search warrant authorizing the seizure of indicia of membership or association must also provide probable cause to believe that the subject has conducted the affairs of the enterprise, at least in part, through a pattern of racketeering activity.
 
 
 83
 Majority Op. at 794. This is said to be required to prevent seizure of "mere evidence" from any suspected member or associate of any enterprise without nexus to criminal activity, which would "offend" Warden. Id. Maj.Op. at 794.
 
 
 84
 This professed concern for fidelity to Warden both misapprehends and distorts that authority's holding. The Warden court has decided, in language not difficult to comprehend, that all that is required is that
 
 
 85
 "in the case of 'mere evidence,' probable cause must be examined in terms of cause to believe that the evidence sought will aid in a particular apprehension or conviction."
 
 
 86
 Warden, 387 U.S. at 307, 87 S.Ct. at 1650. This simple thesis is even more obvious when one considers just what was the "nexus" which was found sufficient in that case: the police found clothing which they reasonably believed would "aid" in identification of the robber. The "mere" evidence did not "wholly" serve to prove that Hayden was the robber, but could reasonably constitute a link in the evidentiary chain supporting the reasonable belief that the man found in the house was the man who had run from the bank. I do not understand what, in this simple concept, so eludes the majority's grasp.
 
 
 87
 In reality, the majority's rationale simply is a construct harking back to the comforting impedimenta of Aguilar and Spinelli, and which accommodates a patent unease with the directions of Warden and the explicit holding of Gates.
 
 
 88
 To this end, two cognate positions are asserted. First, it is said that because the crime involves "association," the affidavit must (presumably invoking the First Amendment) charge that the enterprise is wholly illegal and punishable (as, for instance, inducing panic in a crowded theater, by yelling "fire!"). Second, if the affidavit fails directly to make the total allegation, it cannot be aided by references contained therein adverting to the fact that an indictment was returned, even if the return was to the magistrate's own court, because an indictment establishes no probable cause or else does not establish cause of the right sort.
 
 
 89
 For these grafts on the body of the criminal laws, the majority supplies neither logic nor precedent for the proposition that the warrant must prove that the RICO enterprise is totally illegal. Indeed, not even an indictment has to make that allegation. It has always, until now, been enough that the associational conduct in criminal charges (conspiracy, combination, aid, counsel, assistance, comfort, etc.) be set forth in the terms of the statutory offense and that the forbidding statute be constitutionally sanctioned. The majority has recognized that Congress has the authority to enact the RICO prohibitions, because association may also take the form of conduct, and may be proscribed, as is set forth in United States v. Turkette, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981).
 
 
 90
 The point is that a rule requiring that a search warrant show not only a connection between the items sought and a crime, but show that the conduct constituting the crime is itself "wholly" illegal, is a new invention in the criminal law. Warrants may issue to seize many things not wholly used in misconduct, for example, checkbooks, although some of their entries may relate to such quite innocent things as child support or church dues. The majority does not contend that we are dealing with overbreadth, or that the items described, seized, and subsequently used in evidence, were not probative in proving the defendants' criminal associational conduct. Instead, the majority has rejected the complete array of evidence without identifying a single document, patch, shield, picture, or other item which was admitted into evidence and which was not logically held "indicia."
 
 
 91
 A properly drawn warrant is the opposite of the general warrant, and its issuance is justified because everyone, unless privileged or otherwise excused, may be required to yield up relevant evidence in connection with pending or impending criminal cases. The Fourth Amendment requires specificity as to persons, houses, papers and effects; and these requirements must be made known to a judicial officer by oath or affirmation. Seldom can it be demonstrated that the ongoing or impending prosecution is for conduct wholly bad. That is a moral, not a legal judgment, and, it is with the latter that this criminal process is equipped to deal.
 
 
 92
 The majority errs also in rejecting the significance of the recitals in the affidavits describing the RICO charge which the Grand Jury had returned that morning in a detailed indictment against those whose premises were to be searched. The majority holds that the affidavits were defective in that they did not show that the very persons whose premises were to be searched had themselves conducted the affairs of the enterprise through a pattern of racketeering activity. In other words, the warrant would have to contain plenary allegations as in an indictment or information against these individuals, and in addition, would only be valid for searches of premises belonging to persons so charged, to the exclusion of premises of third persons.
 
 
 93
 Both propositions are incorrect. Making those allegations that associations are criminal in nature, is the function of a criminal pleading, an indictment or information. The materials before the magistrate quite adequately supported their true function--to show probable cause that the items were sought in connection with a described crime, and thus could reasonably aid in convicting persons believed to have committed those crimes, and that they were likely to be found in the described premises. The affidavits described conduct which amounted to the racketeering activity embraced in the statute and which helped to prove that the Hell's Angels Motorcycle Club was a RICO enterprise. They set forth the basis of the affiant's knowledge from which it appeared highly probable that the indicia sought was not only likely to be found only in the possession of members or associates of the enterprise, and that such indicia would be found in the premises to be searched. The documents under oath recited that a formal RICO indictment had that morning been returned to the district court by the Grand Jury charging each person with conspiracy to conduct, or with participation in conducting, the affairs of the enterprise, the Hell's Angels Motorcycle Club.
 
 
 94
 Citing United States v. Ellsworth, 647 F.2d 957 (9th Cir.1981), cert. denied 456 U.S. 944, 102 S.Ct. 2008, 72 L.Ed.2d 465 (1982), the majority held that the references to the indictment had no value. I do not understand why. Ellsworth is not a RICO case, but involved assault upon a federal officer. Second, the search warrant was upheld, not rejected. See id. 647 F.2d at 964 ("[T]he magistrate was not in error in finding probable cause.").
 
 
 95
 Moreover, the Ellsworth court did not hold that the magistrate could not, in determining probable cause, consider the indictment which a Grand Jury had returned. The Ellsworth court said that the magistrate could take judicial notice of the indictment.
 
 
 96
 In addition to the information supplied by the witnesses on the scene identifying appellant with the alleged crime, and thus targeting his house as the possible location of critical evidence, we have the indictment. The magistrate has the same right as the court to take judicial notice, United States v. Sevier, 539 F.2d 599, 603 (6th Cir.1976), and affiant having advised the magistrate of the indictment, the information was before him.
 
 
 97
 Ellsworth, 647 F.2d at 963. The majority has overstated the opinion in Ellsworth, and has understated the probable cause significance of a valid indictment.
 
 
 98
 It is the function of a Grand Jury "to determine whether there is sufficient probable cause to require an accused to stand trial before a petit jury." But the majority views that kind of probable cause as a different species. It says that while the indictment "conclusively determines the existence of probable cause [to require] issuance of an arrest warrant without further inquiry * * *," it has little significance so far as search warrants are concerned. Majority Op. at 794. The majority's assertions that "an indictment alone constitutes [in]sufficient probable cause to issue a search warrant," id., at 795, is a non sequitur, for the indictment did not stand alone as the basis for the magistrate's finding of probable cause.
 
 
 99
 In addition to detailed recitals showing the nature of the indicia, the connection with association or membership in the subject enterprise, and the inference that possession of such indicia indicated membership or association, the affidavits referred to information received, from persons believed to be reliable, linking membership and association to the suspects and stated the affiant's own professional conclusions that such affinity existed. Paragraphs 25 and 26 recited that each "suspect" was
 
 
 100
 identified as a member of the Hell's Angels Motorcycle Club in a report, dated April 1973, written by the Organized Crime and Criminal Intelligence Branch of the California State Department of Justice.
 
 
 101
 Government's Partial Excerpt of Record for Rehearing at 68.
 
 
 102
 The reference to the Grand Jury indictment set forth, inter alia:
 
 
 103
 p 26. That on June 13, 1979, the Federal Grand Jury for the Northern District of California, at San Francisco, returned a sealed indictment, which charges that [each appellant] was associated with an enterprise within the meaning of 18 U.S.C. Sec. 1961(4), to wit, the HELLS ANGELS MOTOR CLUB, from on or about January 1, 1966, to the date of the indictment.
 
 
 104
 Id. It is, of course, no valid objection that the two recitals were based on hearsay because hearsay is admissible in finding probable cause.
 
 
 105
 The issue then is whether the magistrate could consider, in looking for probable cause, that the Grand Jury arm of his court had returned an indictment charging the persons whose premises were to be searched with the RICO offenses, specific indicia and the locations of which were described with particularity in the affidavit.
 
 
 106
 Perhaps the initial inquiry is--what is probable cause in the context of warrants for search? In Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949), Justice Rutledge said:
 
 
 107
 In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. The standard of proof is accordingly correlative to what must be proved.
 
 
 108
 "The substance of all the definitions" of probable cause "is a reasonable ground for belief of guilt." McCarthy v. De Armit, 99 Pa.St. 63, 69, quoted with approval in the Carroll opinion. 267 U.S. at page 161 [45 S.Ct. at page 288]. And this "means less than evidence which would justify condemnation" or conviction, as Marshall, C.J., said for the court more than a century ago in Locke v. United States, 7 Cranch 339, 348 [3 L.Ed. 364]. Since Marshall's time, at any rate, it has come to mean more than bare suspicion: Probable cause exists where "the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed. Carroll v. United States, 267 U.S. 132, 162 [45 S.Ct. 280, 288, 69 L.Ed. 543].
 
 
 109
 338 U.S. at 175-76, 69 S.Ct. at 1310-11.
 
 
 110
 Legal scholars have pointed out that, while the Carroll-Brinegar statement is frequently cited,
 
 
 111
 * * * it is important to keep in mind that probable cause for search requires a somewhat different kind of conclusion than probable cause for arrest. For arrest, there must be a substantial probability that a crime has been committed and that the person to be arrested committed it; for search, there must be a substantial probability that certain items are the fruits, instrumentalities or evidence of crime and that these items are presently to be found at a certain place.
 
 
 112
 Y. Kamisar, W. LaFave, & J. Israel, Modern Criminal Procedure, 268 (5th ed. 1980). The courts have not consistently distinguished between probable cause for arrest and for search, although the requirement of reasonable showing that the items will be found where indicated involves considerations of staleness of the information and other concerns less pertinent to arrests than searches. The primary emphasis in examining probable cause for arrest is the degree of reasonableness for belief that a crime has been committed. In a search for evidence of a crime, the primary emphasis is upon the particularity of description of items and place, although it is also important to establish the probability that a crime has been committed, since both the fact and the nature of the offense are components of the reasonableness of the officer's conclusion that the evidence will be found.
 
 
 113
 The issue is now settled. Rules 4(b) and 41(c) of the Federal Rules of Criminal Procedure explicitly provide that "[t]he finding of probable cause may be based upon hearsay evidence in whole or in part." See also Rule 5.1 Fed.R.Crim.P. (same rule applies at Preliminary Examination hearing). We turn to the question: why may not the magistrate take note of the indictment and that document's bearing on probable cause?
 
 
 114
 An indictment has many procedural consequences. Without more, it justifies the issuance of a warrant of arrest, whereas an information or complaint would require a showing of probable cause under oath. Rule 9(a) Fed.R.Crim.P. Under 18 U.S.C. Sec. 3060(e), a person charged (other than by indictment) is entitled to a preliminary hearing before the magistrate to determine probable cause unless, prior to the date fixed for hearing, an indictment is returned.
 
 
 115
 An indictment is not just another piece of paper. It has substantive value in the search for probable cause. This is inescapably clear in Gates. Justice Rehnquist noted that Aguilar's original phrasing of the "two-pronged test" for determining probable cause was really only intended as guides to the finding, and only required that:
 
 
 116
 The magistrate must be informed of some of the underlying circumstances from which the informant concluded that ... narcotics were where he claimed they were, and some of the underlying circumstances from which the officer concluded that the informant ... was "credible" or his information "reliable."
 
 
 117
 Gates, 103 S.Ct. at 2328, n. 6 (citation omitted) (emphasis in original). He observed that the court had neither intended to mandate "rigid compartmentalization" of the Aguilar inquiries, nor that the inquiries be "elaborate exegeses of [in that case] the informant's tip." Id. And finally, he said that this was demonstrated by the decision in Jaben v. United States, 381 U.S. 214, 85 S.Ct. 1365, 14 L.Ed.2d 345 (1965) (filing of a [detailed] complaint could establish the probable cause necessary to extend statute of limitations):We held there that a criminal complaint showed probable cause to believe the defendant had attempted to evade the payment of income taxes. We commented that:
 
 
 118
 "Obviously any reliance upon factual allegations necessarily entails some degree of reliability upon the credibility of the source. * * * Nor does it indicate that each factual allegation which the affiant puts forth must be independently documented, or that each and every fact which contributed to his conclusions requires that enough information be presented to the Commissioner to enable him to make the judgment that the charges are not capricious and are sufficiently supported to justify bringing into play the further steps of the criminal process."
 
 
 119
 Id. (Citation omitted) (emphasis in original).
 
 
 120
 I do not understand why an indictment, which for almost every other practical pre-trial purpose is recognized as justifying probable cause to believe that those named therein have indeed committed the offenses charged, cannot legitimately contribute to the presentation of "enough information" to enable the judicial officer to make his judgment.
 
 
 121
 In still other respects, the majority's holding is unsupported by the authority which it cites. Early in the opinion, Zurcher v. The Stanford Daily, 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978), was invoked for the proposition that the ordinary Fourth Amendment requirements need additional protections "[w]hen activity protected by the First Amendment becomes the subject of a criminal investigation." Majority Op. at 791. Applied here, according to the majority, this need for additional protection forbids using search warrants for "indicia" (associational) materials, unless the affidavit describes the association as having connection with criminal conduct (carrying on a RICO enterprise) which is entirely illegal. Further, those whose premises are to be searched must themselves be shown to have been engaged in that wholly illegal associational conduct.
 
 
 122
 Neither the First Amendment nor Zurcher support this view of the interplay between the two Amendments.
 
 
 123
 Zurcher, which the author, Justice White, described as an effort to "reconstrue the Fourth Amendment" so as to forbid issuance of a warrant to search premises of a non-suspect third party "except in the most unusual circumstances," Zurcher, 436 U.S. at 550, 98 S.Ct. at 1973, in no way stands for the proposition enunciated by the majority.
 
 
 124
 In Zurcher, a search warrant was issued to seize photographs and other materials in a newspaper office relevant to identifying individuals who had participated in a demonstration which finally resulted in violence between the participants and police officials. There was no indication that personnel of the newspaper had themselves engaged in any unlawful conduct. The warrant was executed, search was made, and photographs were seized.
 
 
 125
 The newspapers and others sued the law enforcement officials under 42 U.S.C. Sec. 1983, and the district court held that the warrant was improperly issued. It concluded that a search warrant could not issue to search a newspaper office whose personnel was not suspected of crime unless there was reason to believe that the paper would not honor a subpoena duces tecum, except in the "rare" circumstances that otherwise the material might be removed from the jurisdiction or destroyed, and that a court order to produce would not be obeyed. This circuit affirmed.
 
 
 126
 The Supreme Court granted certiorari and reversed. Justice White's opinion held:
 
 
 127
 (1) A search warrant may issue for items in the possession of a third party who is not suspected of crime; the critical element is not whose possession is involved, but whether there is reasonable cause to believe that the "things" to be seized are to be found on the property. Rule 41 of the Federal Rules of Criminal Procedure authorizes search for "any * * * property that constitutes evidence of a criminal offense." The reference is to "things," not to arrests.
 
 
 128
 (2) Search warrants have value in locating evidentiary items early in an investigation, before all the actors or facts may be known. Privacy interests are protected because "[t]he Fourth Amendment has itself struck the balance between privacy and public need, and there is no occasion for a court to revise the Amendment and strike a new balance by denying the search warrant in the circumstances present here * * * " Zurcher, 436 U.S. at 559, 98 S.Ct. at 1978.
 
 
 129
 (3) "Neither the Fourth Amendment nor the cases requiring consideration of First Amendment values in issuing search warrants, however, call for imposing * * * [the special rules imposed by the district court]." Id., 436 U.S. at 565, 98 S.Ct. at 1981.
 
 Justice White concluded:
 
 130
 Further, the prior cases do no more than insist that the courts apply the warrant requirements with particular exactitude when First Amendment interests would be endangered by the search. As we see it, no more than this is required where the warrant requested is for the seizure of criminal evidence reasonably believed to be on the premises occupied by a newspaper. Properly administered, the preconditions for a warrant--probable cause, specificity with respect to the place to be searched and the things to be seized, and overall reasonableness--should afford sufficient protection against the harms that are assertedly threatened by warrants for searching newspaper offices.
 
 
 131
 Id.
 
 
 132
 Zurcher is on point, for it literally deals with First Amendment freedoms of speech and of the press, while the majority here has focused on the correlative importance of privacy and the freedom of association. The values of both are alike. The "exactitude" referred to by Justice White is an important condition, but what it implicates, especially in the light of Gates, is the "common sense" determination by the magistrate that the materials before him are enough to show the probability that the "things" described will aid in proving the crime and will be found in the places described. The majority's new rule does not withstand the challenges of precedent and logic under Zurcher.
 
 
 133
 Gates does apply to this case, it is dispositive. The magistrate's duty, in weighing probable cause for a search warrant, is
 
 
 134
 simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit * * * there is a fair probability that contraband or evidence of a crime will be found in a particular place.
 
 
 135
 Gates, 103 S.Ct. at 2332. This precept is sound when dealing with the anonymous informant. Its soundness also applies to search warrants.
 
 Gates also limits our own review:
 
 136
 [T]he duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis * * * for conclud[ing]" that probable cause existed.
 
 
 137
 Id.
 
 
 138
 In its mistaken concern to find and invoke superseded restrictions, the majority has lost sight of the very core of the "right" contained in the Fourth Amendment. It is not a right forbidding all searches and seizures. It is a right to be secure against "unreasonable searches and seizures." That is the "overall reasonableness" which the Zurcher Court said will, properly administered, afford the protection which the Amendment was adopted to bring.
 
 
 139
 The affidavit here satisfied all reasonable requirements for particularity. The impartial judicial officer properly gave weight to an indictment, "fair on its face," which he knew had been returned and that, along with all that information incorporated in the affidavit, and the information of which he could take judicial notice, gave him probable cause to believe that the persons named had been involved in the RICO offenses; that the items described would aid in proof thereof; and they would probably be found in the places to be searched.
 
 
 140
 On this record as it came to us from the district court before the decision in Gates, I was convinced that the convictions should be affirmed. In the brighter light of Gates, and after careful reading of the majority's unconvincing effort to avoid or distinguish the Supreme Court's holding, I am more than ever convinced that reversal is not mandated by the Fourth Amendment, does not comport with current precedent, and does not serve the interests of sound administration of justice. I would still affirm.
 
 
 141
 Commentary on Order Modifying Majority's Opinion
 
 
 142
 As its final effort, the majority has receded from its position which had been that the affidavit in a RICO case is insufficient unless it shows that the enterprise was "wholly illegitimate." Maj. Op. passim. The majority now argues that the affidavit is not sufficient to justify a search for evidence of "mere association" unless it also shows that "such a large portion of the subject organization's activities are illegitimate * * * that the enterprise could be considered, in effect, wholly illegitimate." Without that showing the affidavit must independently establish "probable cause to believe that the subject has conducted the affairs of the enterprise, at least in part, through a pattern of racketeering activity." Id., at 794. This is the majority's bottom line and it is the point at which I have consistently disagreed. Their change is only cosmetic, however, suggesting that the majority is in reality demanding less than it does.
 
 
 143
 The majority continues to impose an unwarranted and onerous burden upon the practical task of issuing search warrants. It has unnecessarily created obstacles to the usefulness of a very ancient and valuable procedure. There is no basis for requiring that the evidence-gathering request present the ultimate evidence before that evidence has been obtained.
 
 
 144
 Nothing has been changed. Therefore, I respectfully continue to dissent.
 
 
 
 *
 The Honorable Robert M. Takasugi, United States District Judge for the Central District of California, sitting by designation
 
 
 [1]
 A Prescott warrant authorizes the search of a home for a person named in an accompanying arrest warrant. United States v. Prescott, 581 F.2d 1343 (9th Cir.1978)
 
 
 [2]
 Because we hold the warrants invalid as lacking probable cause, we do not reach defendants' additional contentions that the warrants were facially overbroad, that the warrants were a mere pretext for a general search, and that the warrants' execution exceeded their scope
 
 
 [3]
 The affidavit in Ellsworth provided a strong showing of probable cause independent of the fact that an indictment had been returned against the defendant. The affidavit disclosed that six eyewitnesses, all of whom were members of the general public, had witnessed the assault on the victim by a person matching the defendant's description. 647 F.2d at 963-64
 
 
 [4]
 Under Sec. 844 of the California Penal Code, a police officer may enter a dwelling in order to effect an arrest only if there are reasonable grounds for believing the suspect is inside. Smith urges that Sec. 844 was violated because the officers had no reason to believe Smith would be found in the rear dwelling. Because we hold that the officers entered the rear building pursuant to a valid consent, we need not decide whether section 844 is relevant to a federal criminal proceeding or whether the officers had "reasonable cause" to believe Smith would be found inside
 
 
 [5]
 We distinguish this case from those in which the prior conviction is being introduced for impeachment purposes under Fed.R.Evid. 609. Absent exceptional circumstances, evidence of a prior conviction admitted for impeachment purposes may not include collateral details and circumstances attendant upon the conviction. United States v. Dow, 457 F.2d 246, 250 (7th Cir.1972); Annot., 39 A.L.R.Fed. 570 Sec. 7, at 582 (1978)
 
 
 [6]
 A post-trial reindictment can often raise double jeopardy concerns. Because Counts I, II, and XVII resulted in a mistrial, however, and because those counts were not reinstated, we are not faced with a double jeopardy issue. See United States v. Sanford, 429 U.S. 14, 97 S.Ct. 20, 50 L.Ed.2d 17 (1976)
 
 
 [7]
 On the question of prejudice, see this court's en banc decision in United States v. Lamb, 529 F.2d 1153 (9th Cir.1975) (en banc). In Lamb, we discussed Rule 24(c) at great length and held that the district court committed reversible error in appointing an alternate juror to deliberate with the regular jurors after deliberations had begun. The instant case presents no such compelling facts, and we do not read Lamb as holding that the violation of Rule 24(c) is prejudicial error per se. See Lamb, 529 F.2d at 1156 n. 3. In our opinion, reversal would be pointless where there is no reasonable possibility that the alternate jurors in any manner affected the verdict. See United States v. Watson, 669 F.2d 1374, 1392 (11th Cir.1982); United States v. Allison, 481 F.2d 468 (5th Cir.1973), subsequent appeal 487 F.2d 339 (5th Cir.1973), cert. denied, 416 U.S. 982, 94 S.Ct. 2383, 40 L.Ed.2d 759 (1974); Annot., 10 A.L.R.Fed. 185 Sec. 10, at 204 (1972) ("Whether it constitutes prejudicial error for a trial judge to fail to discharge alternate jurors as early as required has been held to depend upon the circumstances of the particular case.")