**Edward F. HOFFMAN, Jr., Plaintiff,**

v.

**COUNTY OF DELAWARE, Michael Talarico, Mark Hamilton, William R. Moon, and Craig Whitten, Defendants.**

No. 97–CV–1009.

United States District Court,
N.D. New York.

March 12, 1999.

Office of Thomas P. Halley, Poughkeepsie NY, for plaintiff.

Ferrara, Fiorenza Law Firm, East Syracuse NY, for defendants County of Delaware, Mark Hamilton, and William Moon.

Office of the Attorney General, The Capitol Litigation Bureau, Albany NY, for defendant Talarico.

Hogan, Sarzynski Law Firm, Binghamton NY, for defendant Whitten, Michael G. Surowka, Senta B. Siuda, AAG, Frank W. Miller, Thomas P. Halley, of counsel.

## MEMORANDUM—DECISION & ORDER

McAVOY, Chief Judge.

The instant litigation arises out of Plaintiff Edward Hoffman's ("Hoffman") removal to and detention in a hospital pursuant to Article 9 of the New York State Mental Hygiene Law. Hoffman asserts federal

claims pursuant to 42 U.S.C. § 1983 and state law claims for false imprisonment, negligence, malpractice, and intentional infliction of emotional distress. Defendants County of Delaware (the "County"), Michael Talarico ("Talarico"), Mark Hamilton ("Hamilton"), William Moon ("Moon") and Craig Whitten ("Whitten") (collectively, the "defendants") now move for summary judgment pursuant to FED.R.CIV.P. 56 seeking dismissal of the Complaint in its entirety.[1]

## I. BACKGROUND

Because this is a motion for summary judgment by the defendants, the following facts are presented in the light most favorable to Hoffman. *See Ertman v. United States,* 165 F.3d 204, 206 (2d Cir.1999).

Hoffman was a police officer for the Village of Sidney (the "Village") Police Department. On January 8, 1995, Hoffman responded to a call that a child had stopped breathing. In an effort to reach the scene, Hoffman activated his siren and light bar and pulled into the oncoming traffic lane to pass a slower moving vehicle. As he did so, another vehicle came over the crest of a hill and had to steer off of the road to avoid a head-on collision with Hoffman. Hoffman also lost control of his vehicle and crashed into a "no parking" sign. Although the collision shattered his windshield and limited his visibility, Hoffman proceeded to the scene of the emergency.

Disciplinary charges were filed against Hoffman as a result of this incident. After a hearing, the hearing officer found that Hoffman: (1) drove a police vehicle in an improper, unsafe, reckless, careless, or negligent manner; (2) endangered the safety and welfare of himself and others; (3) damaged a police vehicle; and (4) failed to follow proper police department rules or regulations. Although the hearing officer recommended that Hoffman be terminat-

ed, the Village opted to suspend him for ninety days without pay.

Hoffman filed a petition pursuant to N.Y.C.P.L.R. Art. 78 challenging the determination of the hearing officer. Both that determination and his suspension were upheld by the Tompkins County Supreme Court and the Appellate Division, Third Department. *See Hoffman v. Village of Sidney,* 235 A.D.2d 698, 652 N.Y.S.2d 346 (3d Dep't 1997).

On September 9, 1995, Hoffman informed his superiors that he was experiencing pain in his left knee and hip areas. As a result, Hoffman was disabled from work and sought Workers' Compensation benefits and benefits under N.Y.GEN.MUN. LAW 207–c. After the Village denied and/or discontinued benefits to Hoffman, a series of disputes arose between Hoffman and the Village of Sidney regarding these benefits.

On June 28, 1996, Officer J.R. Blot ("Blot") entered the Sidetrack Lounge in Sidney, New York. Hoffman also was at the Sidetrack Lounge, and he and Blot engaged in conversation. Hoffman told Blot that he was experiencing continued problems at work and that he was still out on disability. Hoffman stated that certain persons in high positions had engaged in illegal drug activities in and around the Village of Sidney. Hoffman insisted that he was aware of these illegal activities and that the people involved were "out to get him" and had instituted a course of harassment against him. In fact, Hoffman attributed his difficulties in obtaining benefits to his knowledge of the alleged unlawful activities. Hoffman apparently told Blot that the former Commissioner of Police, Charles Bessett ("Bessett"), attempted to break into his apartment to steal and/or plant evidence. Hoffman indicated that if Bessett or anyone else ever at-

---

1. The Complaint asserted causes of action against the Village of Sidney and William Masters. The parties entered into a stipula- tion "So Ordered" by this Court on March 4, 1999, whereby Hoffman withdrew all claims against these defendants.

tempted to enter his apartment, they would be greeted with a shotgun.

Hoffman asserted that Investigators Charles and Chandler, Assistant District Attorney Davis, and Bessett were involved in these unlawful drug activities. Hoffman believed that Whitten, although not directly involved in the drug activity, refused to take any action. Hoffman apparently stated that he would like to meet up with "these guys" in a men's room, that he would use physical force upon them, and that the coroner might need to be called. Hoffman insists, however, that he only stated that he would like to "punch them out." Hoffman believed these individuals had systematically destroyed his life over a fifteen year period.

Blot became concerned that Hoffman was overly consumed with this alleged conspiracy against him. He also noted that Hoffman had been drinking excessively and that he maintained numerous firearms in his apartment. Blot, therefore, contacted Whitten and the Delaware County Department of Social Services Crisis Intervention Officer/Part–Time Deputy Sheriff, Mark A. Hamilton. Hamilton discussed the matter with Defendants Commissioner of the Delaware County Department of Social Services William R. Moon and County Psychiatrist Dr. Michael Talarico.

Based on the discussion with Blot, Talarico and Moon advised that further investigation was warranted. Thus, Hamilton and Officer J.J. Bowie ("Bowie") were sent to assess Hoffman's mental health. Hamilton met with Hoffman at the Community Lounge, a bar located in the same building in which Hoffman resided. Ham-

ilton told Hoffman about his conversation with Blot and that he was performing an assessment pursuant to N.Y. MENTAL HYG. LAW § 9.41.[2] He also offered Hoffman mental health and/or social services to assist him in resolving his anger, frustration, and hostility.

Hoffman denied having an alcohol problem, but did not deny making threats against or expressing hostility towards certain Village officials. Hoffman reiterated his belief that his troubles with the Village stemmed from an incident in 1987 involving Deputy Gritman, Investigator Charles, Assistant District Attorney Davis and former Police Commissioner Bessett. At one point in time during the conversation, Bowie reached into his shirt pocket to retrieve a cellular phone. In response, Hoffman got very excited, exhibited a certain degree of nervousness or paranoia, and questioned whether Hamilton and Blot were recording their conversation. Hoffman was quieted after being reassured that the device was only a cellular telephone.

According to Hamilton:

it became apparent that Mr. Hoffman believes that whatever occurred in 1987 has dramatically, through a conspiracy of all the aforementioned persons, directly influenced the direction of his police career and created the conflict that he is now embroiled in with ... the Village. Mr. Hoffman indicated that he spends time in writing up notes and making voluminous records on his present and past conflicts associated with this conspiracy and his present job diffi-

---

**2.** N.Y. Mental Hyg.Law § 9.41 provides that: Any peace officer, when acting pursuant to his or her special duties, or police officer who is a member of the state police or of an authorized police department or force or of a sheriff's department may take into custody any person who appears to be mentally ill and is conducting himself or herself in a manner which is likely to result in serious harm to the person or others. Such officer may direct the removal of such person or remove him or her to any hospital specified in subdivision (a) of section 9.39 or any comprehensive psychiatric emergency program specified in subdivision (a) of section 9.40, or, pending his or her examination or admission to any such hospital or program, temporarily detain any such person in another safe and comfortable place, in which event, such officer shall immediately notify the director of community services or, if there be none, the health officer of the city or county of such action.

culty. Hoffman declined to accept any mental health or social services.

*See* Uniform Investigative Report annexed to the Dec. 1, 1998 aff. of Frank Miller as Ex. 23. Hamilton thereafter contacted all concerned parties and warned them of Hoffman's threats.

Based upon the information provided by Hamilton and Blot, on July 18, 1996 at approximately 10:00 a.m., Talarico issued a "pick-up order" pursuant to N.Y. MENTAL HYG.LAW § 9.45.[3] Defendant William Masters, a Supervising Social Worker for Delaware County, and Talarico, also wrote a report supporting the issuance of the pick-up order. The report indicated that Hoffman appears:

> obsessionally fixated and dwells upon his report of a conspiracy originating in 1987, ... sees himself persecuted by the Village, ... is thought to be a serious abuser of alcohol, if not alcohol dependent, ... is known to have collected a substantial arsenal, ... [has] seclud[ed] himself and retreat[ed] from normal in-

teraction with other people, ... does not allow anyone up the stairs to knock on his apartment door, ... [and that] he has spoken to various individuals about obtaining sand bags in which to barricade his room.

The report concluded that "[b]ecause he is seriously angry within the framework of unrealistic delusions, because he feels threatened and may have barricaded his apartment, ... and because he has a drinking problem, the increasing tension between he and his employer and the world in general are seen as meriting a serious evaluation for dangerousness." The pick-up order stated that it was based upon information provided by Hamilton, who was believed to be a police officer with the County Sheriff's Department. Moon also applied to have Hoffman involuntarily admitted to a hospital pursuant to N.Y. MENTAL HYG.LAW § 9.27[4], although Hoffman was ultimately admitted pursuant to N.Y. MENTAL HYG.LAW § 9.39[5], or argu-

---

3. Pursuant to N.Y. MENTAL HYG.LAW § 9.45:

> The director of community services or the director's designee shall have the power to direct the removal of any person, within his or her jurisdiction, to a hospital approved ... if the parent, adult sibling, spouse or child of the person, the committee of the person, a licensed psychologist, registered professional nurse or certified social worker currently responsible for providing treatment services to the person, a licensed physician, health officer, *peace officer or police officer reports to him that such person has a mental illness for which immediate care and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or herself or others. It shall be the duty of peace officers,* when acting pursuant to their special duties, or police officers, who are members of an authorized police department or force or of a sheriff's department to assist representatives of such director to take into custody and transport any such person.... Such person may then be retained in a hospital pursuant to the provisions of section 9.39 or in a comprehensive psychiatric emergency program pursuant to the provisions of section 9.40 of this article. (Emphasis supplied).

4. Section 9.27 provides, in part, that:

> (a) The director of a hospital may receive and retain therein as a patient any person alleged to be mentally ill and in need of involuntary care and treatment upon the certificates of two examining physicians, accompanied by an application for the admission of such person....
>
> (b) Such application must have been executed within ten days prior to such admission. It may be executed by any one of the following....
>
> 5. the director of community services or social services official, as defined in the social services law, of the city or county in which any such person may be.

5. A person who has been taken into custody pursuant to a N.Y. MENTAL HYG.LAW § 9.45 pick-up order may be admitted into a hospital only in conformance with § 9.39. Section 9.39 provides, in relevant part, that:

> (a) The director of any hospital maintaining adequate staff and facilities for the observation, examination, care, and treatment of persons alleged to be mentally ill and approved by the commissioner to receive and retain patients pursuant to this section may receive and retain therein as a patient for a period of fifteen days any person alleged to have a mental illness for which immediate observation, care, and treatment in a hospi-

ably, in the alternative, N.Y. Mental Hyg. Law § 9.37.[6]

Later that day, Hoffman was stopped on Interstate 88 by the New York State Police. The State Police contacted the County Sheriff's Office. Hamilton and Blot arrived on the scene and took Hoffman into custody and transported him to the A.O. Fox Memorial Hospital Crisis Center for observation. At the time he was taken into custody, Hoffman had two loaded pistols in the front seat of his car, two long arms in his trunk, and a knife. Thereafter, and as a result of the issuance of the pick-up order, Delaware County Court Judge Robert L. Estes issued an order

---

6. Section 9.37 provides, in part, that:

The director of a hospital, upon application by a director of community services or an examining physician duly designated by him or her, may receive and care for in such hospital as a patient any person who, in the opinion of the director of community services or the director's designee, has a mental illness for which immediate inpatient care and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or herself or others. The need for immediate hospitalization shall be confirmed by a staff physician of the hospital prior to admission. Within seventy-two hours, excluding Sunday and holidays, after such admission, ... the certificate of another examining physician who is a member of the psychiatric staff of the hospital that the patient is in need of involuntary care and treatment shall be filed with the hospital....

(b) The application for admission of a patient pursuant to this section shall be based upon a personal examination by a director of community services or his designee. It shall be in writing and shall be filed with the director of such hospital at the time of the patient's reception, together with a statement in a form prescribed by the commissioner giving such information as he may deem appropriate....

(d) After signing the application, the director of community services or the director's designee shall be authorized and empowered to take into custody, detain, transport, and provide temporary care for any such person. Upon the written request of such director or the director's designee it shall be the duty of peace officers, when acting pursuant to their special duties, or police officers who are members of the state police or of an authorized police department or force or of a sheriff's department to take into custody and transport any such person as requested and directed by such director or designee....

Here, on July 17, 1996, Dr. Bhonslay, the Director of Community Services' Designee, applied for an involuntary admission pursuant to § 9.37. The need for immediate hospitalization was confirmed by Dr. Lavin, a staff physician, prior to admission. Hoffman was provided with a follow-up examination by Dr. Bolove on July 19, 1996, which is well within the requisite seventy-two hours mandated by the statute. Of course, these actions also were in compliance with the requirements of § 9.37 set forth above.

---

tal is appropriate and which is likely to result in serious harm to himself or others. "Likelihood to result in serious harm" as used in this article shall mean:

1. substantial risk of physical harm to himself as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that he is dangerous to himself, or

2. a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm.... The director shall admit such person pursuant to the provisions of this section only if a staff physician of the hospital upon examination of such person finds that such person qualifies under the requirements of this section. Such person shall not be retained for a period of more than fortyeight hours unless within such period such finding is confirmed after examination by another physician who shall be a member of the psychiatric staff of the hospital....

(b) Within fifteen days of arrival at the hospital, if a determination is made that the person is not in need of involuntary care and treatment, he shall be discharged unless he agrees to remain as a voluntary or informal patient. If he is in need of involuntary care and treatment and does not agree to remain as a voluntary or informal patient, he may be retained beyond such fifteen day period only by admission to such hospital or another appropriate hospital pursuant to the provisions governing involuntary admission on application supported by medical certification and subject to the provisions for notice, hearing, review, and judicial approval of retention or transfer and retention governing such admissions....

suspending Hoffman's license to possess or carry pistols or revolvers and requiring him to deliver all his pistols and revolvers to the Delaware County Sheriff. The order was served on Hoffman at A.O. Fox Memorial Hospital.

Hoffman consented to have Officer Kent Lewis retrieve the pistols from his apartment. Hoffman claims that he only gave permission for Officer Lewis to enter his apartment. Nonetheless, Hamilton, Blot, Lewis and Sergeant Tiska secured Hoffman's handguns from his apartment and retrieved an additional four handguns from his sister's home.

In conformance with the requirements of N.Y. MENTAL HYG.LAW § 9.39, the need for Hoffman's immediate hospitalization was confirmed by staff physician Shivaji Bhonslay prior to admission. Dr. Bhonslay certified that he personally examined Hoffman and opined that he had a mental illness for which immediate inpatient care and treatment in a hospital is appropriate. Bhonslay further opined that Hoffman posed a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others were placed in reasonable fear of serious physical harm. *See* Ex. "A" annexed to the Nov. 25, 1998 Aff. of Senta B. Siuda. At approximately 6:00 p.m. on July 18, 1996, Hoffman was examined by Dr. Lavin, who confirmed Hoffman's need for immediate hospitalization. *See id.*

In further compliance with Article 9 of the N.Y. Mental Hyg.Law, Dr. Arnold Bulove, a member of the hospital's psychiatric staff, certified that Hoffman was in need of inpatient, involuntary care on July 19, 1996. *See id.* Dr. Bulove found that Hoffman may be delusional. Hoffman was ultimately diagnosed with adjustment reaction/transient situational disorder. Hoffman was released on July 23, 1996 after Dr. Lavin determined that he no longer posed a threat to either himself or others.

On August 20, 1996, the Village filed charges against Hoffman pursuant to N.Y.

CIVIL SERV.LAW § 75 alleging that Hoffman: (1) threatened one or more persons; (2) failed to follow the directives of the commissioner of police; (3) was unfit for duty as a police officer; (4) violated the police department rules and regulations; and (5) violated the police department manual. A hearing was held at which Hoffman denied making any threats of serious physical harm or death. Hoffman contended that he did not threaten anybody, but that "the worse thing I ever say about [them] is I would like to punch [them] out, but I never do."

The hearing officer concluded that "[t]he credible evidence is clear and convincing beyond doubt that Officer Hoffman made certain statements to J.R. Blot at the Sidetrack Lounge on June 28, 1996 which threatened the lives of certain present or former public officials." The hearing officer sustained charges 1, 2, and 4 and dismissed charge 5. The Village withdrew charge 3. The Village Board adopted the hearing officer's recommendation that Hoffman be terminated effective January 27, 1997.

Hoffman then commenced an Article 78 petition in Supreme Court, Delaware County, challenging his termination from the Village police department. The court found that:

> [a]fter a careful review of the hearing transcript and exhibits, it is abundantly clear that substantial evidence supports the determination of the Hearing Officer.... Finally, given the nature of the conduct and the position of public trust formerly held by petitioner, the penalty imposed by the Hearing Officer is not excessive.

*See Hoffman v. Village of Sidney*, No. 97–170 (Sup.Ct.Delaware County June 18, 1997). Hoffman appealed this decision to the Appellate Division, Third Department, which affirmed. *See Hoffman v. Village of Sidney*, 675 N.Y.S.2d 448 (3d Dep't 1998) The Appellate Division noted that "[Hoffman] engaged in a conversation with a

Special Deputy of the Delaware County Sheriff's Department wherein he made threatening and disparaging statements directed toward, among others, the Village Police Commissioner." *Id.* at 449. The court further stated that "[t]he Special Deputy to whom petitioner made the threatening and disparaging remarks testified at the hearing and, further, other persons testified to the very damaging statements made by the Special Deputy concerning petitioner's threatening statements.... [W]hile petitioner denied making the threats in question, this simply presented a credibility issue to be determined by the Hearing Officer." *Id.* at 449.

On July 24, 1997, Hoffman commenced the instant action against the Village, the County of Delaware, Masters, Talarico, Hamilton, Moon, and Whitten asserting causes of action pursuant to 42 U.S.C. § 1983 and various state law causes of action. The defendants now move for summary judgment pursuant to FED. R.CIV.P. 56 seeking dismissal of the Complaint in its entirety.

## II. DISCUSSION

### A. Summary Judgment Standard

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, judgment may be entered in favor of the moving party if "there is no genuine issue as to any material fact and 11 the moving party is entitled to judgment as a matter of law." *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) On a motion for summary judgment, all facts must be construed in favor of the nonmoving party. *Id.; Buttry v. General Signal Corp.,* 68 F.3d 1488, 1492 (2d Cir. 1995). Where the moving party has supported the motion by affidavits and/or documentary evidence, the non-movant "may not rest upon mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in [ ] rule [56], must set forth specific facts showing that there is a genuine issue [of material fact] for

trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." *Fed.R.Civ.P.* 56(e); *see BellSouth Telecommunications, Inc. v. W.R. Grace & Co.,* 77 F.3d 603, 615 (2d Cir.1996). With this standard in mind, the Court will now address defendants' motion for summary judgment.

### B. Constitutional Deprivation

The first step in addressing defendants' motions for summary judgment is to ascertain whether Hoffman suffered a constitutional deprivation. *See Stuto v. Fleishman,* 164 F.3d 820, 825 (2d Cir.1999). Hoffman asserts three constitutional violations: (1) retaliation for the exercise of his First Amendment right of free speech, (2) involuntarily confinement in a mental hospital in violation of his Fourth Amendment and due process rights guaranteed by the Fourteenth Amendment to the United States Constitution, and (3) an illegal search and seizure in violation of the Fourth Amendment. The Court will address each alleged constitutional deprivation *seriatim.*

### C. First Amendment Claim

■ According to the Complaint, Hoffman has spoken out on matters involving the Village of Sidney and the Village of Sidney Police Department. Specifically, Hoffman accused Whitten and others of "knowledge of a continuing cover up of illegal drug activity in and around the Village of Sidney." Hoffman claims that Defendants Hamilton, Whitten and the County of Delaware had Hoffman confined pursuant to Article 9 of New York's Mental Hygiene Law in retaliation for his exercise of his First Amendment rights.

A plaintiff asserting government conduct in retaliation for the exercise of free speech must demonstrate that "(i) he has an interest protected by the First Amendment; (ii) the defendant's actions were motivated by or substantially caused by

the plaintiff's exercise of that right; and (iii) the defendant's action effectively chilled the exercise of the plaintiff's First Amendment rights." *Connell v. Signoracci*, 153 F.3d 74, 79 (2d Cir.1998). "If the employee meets that burden, the employer is given an opportunity to establish by a preponderance of the evidence that it would have taken the same action even in the absence of the protected speech." *Lewis v. Cowen*, 165 F.3d 154, 163 (2d Cir.1999).

Speech concerning allegations of illegal drug activity by police officers, district attorneys and other public officials concerns public wrongdoing and, thus, constitutes constitutionally protected speech. *See Pickering v. Bd. of Educ.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Lewis*, 165 F.3d at 163–64. Thus, the first prong is satisfied.

With respect to the second prong, the defendants have submitted substantial evidence demonstrating that Hoffman was arrested and brought to the hospital because of their reasonable beliefs that he posed a substantial likelihood of injury to others. In support of this contention, the defendants submitted documentary evidence and affidavits demonstrating that: (1) Hoffman possessed numerous firearms and other weapons in his apartment; (2) he claimed to have sandbagged his apartment to protect him from an attack; (3) he was believed to be an abuser of alcohol; (4) he dwelled on or was obsessed with an alleged conspiracy against him by certain Village officials; (5) he had a history of conflicts with the Village; and (6) he made threatening, homicidal remarks towards certain Village officials.

Hoffman has failed to introduce any evidence countering that of the defendants or otherwise tending to demonstrate that the defendants acted because of Hoffman's protected speech. Hoffman's opposition arguments consist of claims that: (1) Hamilton and Blot never made the statements to Talarico in support of the pick-up order; (2) Hamilton and Moon gave false and/or misleading information to Talarico in support of the pick-up order; and (3) he never threatened anybody, but, at most, stated that he would like to "punch them out." Thus, according to Hoffman, he has demonstrated that the purported threats of physical violence were a pretext for retaliating against him for the exercise of his First Amendment rights.

The defendants respond that the undisputed evidence demonstrates that Hoffman and Blot reported threats of physical violence to Talarico, Hoffman and Moon did not give false or misleading information to Talarico, and Hoffman is collaterally estopped from arguing that he did not threaten anybody because that issue was fully litigated and decided against him at the Civil Service Law § 75 hearing and subsequent state court litigation.

Hoffman's assertion that neither Blot nor Hamilton made the statements upon which Talarico relied is contrary to the undisputed evidence before the Court. Blot had a conversation with Hoffman at the Sidetrack Lounge wherein Hoffman made threats towards certain Village officials. At Hamilton's request, Blot memorialized his conversation with Hoffman. Blot's notes state that:

[Hoffman] spoke of his continued problems he was having with the Village of Sidney, . . . . [O]ver the last few months I had heard these problems and stories before wherein many people in high positions today had done some illegal things in the past that [Hoffman] knew about; and, they were causing most of the problems he was currently having with the Village of Sidney . . . . He believes that past Commission of Police . . . Chuck Bessett has attempted to break into his apartment to steal certain evidence or plant evidence there . . . . He went on to say that if anyone ever tried that again they would be greeted with a shotgun . . . . [Hoffman] stated that he would look forward to the opportunity of meeting "these guys" in a men's room

... [and that] it was my understanding that physical force would be used.

Because of the seriousness of the threats made by Hoffman, Hamilton and Bowie conducted a further investigation, which included talking with Hoffman. During that conversation, Hoffman did not deny his open hostility towards those Village officials. Hoffman's investigative report, Bowie's notes, and the affidavits of Talarico and Whitten corroborate Blot's notes and tend to confirm that Blot reported that Hoffman threatened certain public officials and appeared obsessed with an alleged conspiracy.

For similar reasons, Hoffman's assertion that Hamilton and Moon made false or misleading material representations to Talarico in an effort to procure a pick-up order is similarly unsupported by the evidence. Hoffman contends that there are questions of fact whether "the reports given by [ ] Hamilton and/or [ ] Moon ... were materially misleading, in that they contained information that was not factual and had no basis, or was grossly exaggerated, solely for the purpose of having a 'pickup order' issued." However, the undisputed evidence previously discussed demonstrates that Hamilton and Moon acted in good faith and upon information which they reasonably believed to be true. Based upon all the information available to him, Hamilton concluded that Hoffman was seriously disturbed and posed a significant threat to himself or others and, thus, sought a pick-up order. Hamilton relayed this information to Moon.

Hoffman has failed to set forth any evidence that Hoffman or Moon intentionally misled or misrepresented the facts presented to Talarico in support of the § 9.45 pick-up order. In fact, Hoffman challenged the veracity of this information at his administrative hearing pursuant to Civil Service Law § 75 and the subsequent litigation in state court. The hearing officer found Hamilton's information to be credible and the courts sustained this finding as supported by substantial evidence.

Thus, there is no reason to believe that Hamilton or Moon falsified any information provided to Talarico.

■■■ Finally, the Court agrees that Hoffman is collaterally estopped from denying that he made threats against various Village officials. "Collateral estoppel bars a party from raising a specific factual or legal issue in a second action when the party had a full and fair opportunity to litigate the issue in a prior proceeding." *Transaero Inc. v. La Fuerza Aerea Boliviana*, 162 F.3d 724, 731 (2d Cir.1998). "More specifically, collateral estoppel applies when (1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was actually litigated and actually decided, (3) there was full and fair opportunity to litigate in the prior proceeding, and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits." *Id.*

■■■ A federal court must give a state court judgment "the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 104 S.Ct. 892, 896, 79 L.Ed.2d 56 (1984). Under New York law, "[t]he doctrine of collateral estoppel ... precludes a party from relitigating in a subsequent action or proceeding an issue clearly raised in a prior action or proceeding and decided against that party ... whether or not the tribunals or causes of action are the same." *Ryan v. New York Tel. Co.*, 62 N.Y.2d 494, 478 N.Y.S.2d 823, 826, 467 N.E.2d 487 (1984). "In the application of collateral estoppel with respect to administrative determinations, the burden rests upon the proponent of collateral estoppel to demonstrate the identicality and decisiveness of the issue, while the burden rests upon the opponent to establish the absence of a full and fair opportunity to litigate the issue in prior action or proceeding." *Id.* at 827.

■■■ Applying these principles, the Court finds that collateral estoppel bars

Hoffman from denying that he made threats of physical harm. Charge "A" in Hoffman's disciplinary hearing pursuant to Civil Service Law § 75 was that he had threatened one or more persons. At the hearing, Hoffman denied having made threatening remarks towards any Village officials. Hoffman had the opportunity to call witnesses, cross-examine adversarial witnesses and offer evidence. After reviewing all the evidence and making determinations of credibility, the hearing officer found that "[t]he credible evidence is clear and convincing beyond any doubt that Officer Hoffman made certain statements to J.R. Blot at the Sidetrack Lounge on June 28, 1996 which threatened the lives of certain present or former public officials.... The record is replete with references to the statements made by Officer Hoffman to the effect that: 'If I ever get them alone in a men's room they will come out in body bags and I will go to jail for murder.'"

Hoffman challenged this finding in Supreme Court, Delaware County, which held that "[a]fter a careful review of the hearing transcript and exhibits, it is abundantly clear that substantial evidence supports the determination of the Hearing Officer." Hoffman appealed this decision to the Appellate Division, Third Department, again arguing that he did not make any threats. The Appellate Division stated that "contrary to [Hoffman's] contention, there is substantial evidence to support [the] determination. The Special Deputy to whom [Hoffman] made the threatening and disparaging remarks testified at the hearing and, further, other persons testified to the very damaging statements made by the Special Deputy concerning [Hoffman's] threatening statements.... And while [Hoffman] denied making the threats in question, this simply presented a credibility issue to be determined by the Hearing Officer."

Whether Hoffman made threats was pivotal to the administrative hearing and subsequent review by the New York state courts and was specifically litigated in those prior proceedings. A determination against Hoffman was made by the hearing officer and upheld by the courts. Accordingly, that finding is conclusive as among the parties here and may not be relitigated. *Transaero, Inc.,* 162 F.3d at 730–31.

Thus, Hoffman has failed to proffer any evidence demonstrating that the defendants' actions were motivated or substantially caused by Hoffman's protected speech. Even if Hoffman could demonstrate such a connection, based upon the evidence demonstrating that Hoffman actually threatened certain officials and harbored hostility towards the Village, the defendants have adequately established that they would have taken the same actions *notwithstanding* Hoffman's speech. *Heil v. Santoro,* 147 F.3d 103, 109 (2d Cir.1998).

## D. Due Process Claims/Fourth Amendment Seizure

Hoffman also claims that defendants violated his Fourth and Fourteenth Amendment rights because he was confined without due process of law. Specifically, Hoffman argues that the defendants: (1) failed to follow the statutory procedure contained in Article 9 of the Mental Hygiene Law; (2) obtained a pick-up order based upon false or misleading information; and (3) failed to interview or conduct a physical examination prior to seeking the pick-up order.

The defendants move for summary judgment claiming that they fully complied with the mandates of Article 9 of the Mental Hygiene Law, that they acted in good faith upon information they reasonably believed to be true, and that a pick-up order was issued upon probable cause to believe that Hoffman presented a danger to himself or others. The defendants further argue that they were not involved in the subsequent decisions to admit or retain Hoffman in the hospital once the pick-up order was issued.

Fundamental constitutional liberties clearly are implicated here. "[A] State cannot constitutionally confine ... a non-dangerous individual who is capable of surviving in freedom by [herself] or with the help of willing and responsible family members." *O'Connor v. Donaldson,* 422 U.S. 563, 95 S.Ct. 2486, 2494, 45 L.Ed.2d 396 (1975); *see also Rodriguez v. City of New York,* 72 F.3d 1051, 1061–62 (2d Cir. 1995). "An involuntary civil commitment is a 'massive curtailment of liberty' and it therefore cannot permissibly be accomplished without due process of law." *Rodriguez v. City of New York,* 72 F.3d 1051, 1061 (2d Cir.1995) (quoting *Vitek v. Jones,* 445 U.S. 480, 100 S.Ct. 1254, 1263, 63 L.Ed.2d 552 (1980)). Whether Hoffman's constitutional rights may have been violated will now be discussed with respect to each defendant.

**1. Talarico**

Dr. Talarico was a New York State employee of the Binghamton Psychiatric Center who was on loan to the Delaware County Mental Health Clinic. Talarico signed the "pick-up order" pursuant to N.Y. MENTAL HYG.LAW § 9.45 that led to Hoffman's arrest and subsequent admission to the hospital. Hoffman claims that Talarico should have examined him prior to issuing the pick-up order and that Talarico relied upon a report from Hamilton who is not a police officer.

Talarico acted pursuant to N.Y. MENTAL HYG.LAW § 9.45 which authorizes "[t]he director of community services or the director's designee ... to direct the removal of any person ... to a hospital ... if [a] peace officer or police officer reports to him that such person has a mental illness for which immediate care and treatment in a hospital is appropriate and which is like-ly to result in serious harm to himself or herself or others." The phrase "likely to result in serious harm" is statutorily defined to mean: "(a) a substantial risk of physical harm to the person as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that the person is dangerous to himself or herself, or (b) a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm." N.Y. MENTAL HYG.LAW § 9.01; *see also* N.Y. MENTAL HYG.LAW § 9.39(a).

▬ Contrary to Hoffman's assertion, § 9.45 does not require a physical or mental examination *before* issuing a pick-up order.[7] Of course, the director of community services or the director's designee may not haphazardly issue pick-up orders. Akin to the issuance of an arrest warrant, "[t]he Fourth Amendment requires an official seizing and detaining a person for a psychiatric evaluation to have probable cause to believe that the person is dangerous to himself or others." *Monday v. Oullette,* 118 F.3d 1099, 1102 (6th Cir. 1997); *see Glass v. Mayas,* 984 F.2d 55, 58 (2d Cir.1993). "[A] showing of probable cause in the mental health seizure context requires only a 'probability or substantial chance' of dangerous behavior, not an actual showing of such behavior." *Monday,* 118 F.3d at 1102; *see Project Release,* 722 F.2d at 972–75.

▬ Here, the facts as known by Talarico demonstrate that he had probable cause to issue a pick-up order. *See e.g. Richardson v. Nassau County Medical Center,* 840 F.Supp. 219, 220–21 (E.D.N.Y. 1994); *Thornton v. City of Albany,* 831 F.Supp. 970, 985 (N.D.N.Y.1993). Talari-

---

7. As previously indicated, once an individual has been brought to the hospital, the hospital must comply with N.Y. MENTAL HYG.LAW § 9.39 which provides that the director of the hospital "shall admit such person ... only if a staff physician of the hospital upon examination of such person finds that such person qualifies under the requirements of this section." These statutory mandates and the procedural safeguards contained in Article 9 were undisputedly followed here; thus, Hoffman was afforded all process that was due. *See Project Release v. Prevost,* 722 F.2d 960, 971 (2d Cir.1983).

co spoke to both Hamilton and Blot who stated that Hoffman was known to harbor ill feelings towards several former and current Village officials; he blamed many of his problems on an alleged conspiracy by these individuals to cover up illegal drug activity in the Village; he believed the former police commissioner attempted to break into his apartment to steal and/or plant evidence; he appeared to be paranoid; he threatened violence towards certain city officials; he did not deny making the threatening comments upon subsequent investigation; he was known to have a large collection of firearms and other weapons; he was thought to abuse alcohol; and he was believed to have sandbagged his apartment as protection from an attack. Based upon all this information, Talarico concluded that Hoffman exhibited unreasonable delusions of persecution, that he was "seriously angry," and has "increasing tension [with] his employer." Accordingly, Talarico concluded that Hoffman needed "a serious evaluation for dangerousness" and signed a 9.45 pick-up order. This information, as known to Talarico at the time, was objectively sufficient to establish a substantial likelihood of dangerous behavior that was likely to result in harm to others. *See Glass*, 984 F.2d at 57; *Richardson*, 840 F.Supp. at 221–22 (psychiatrist entitled to qualified immunity for authorizing involuntary commitment where plaintiff carried knives for "for his own protection" and was found to be paranoid, delusional and dangerous); *Higgins v. City of Oneonta*, 208 A.D.2d 1067, 617 N.Y.S.2d 566, 568–69 (3d Dep't 1994) (finding that it was objectively reasonable to admit a former police officer who made phone calls to the police department stating that he wanted to send "retirement presents" to the mayor and city attorney, that "they're gonna remember for a long time," that "[i]f I told you what I had in mind ... in twenty minutes a police car would be down here," and that "what I have in mind for ya [is] not very pleasant."); *see also Ricciuti v. New York City Transit Auth.*, 124 F.3d 123, 128 (2d Cir.1997). Because Talarico acted in accordance with § 9.45 and upon a finding of probable cause to issue the pick-up order, Hoffman was afforded all process that was due and, accordingly, has suffered no Fourth or Fourteenth Amendment violation.

■ Hoffman next argues that Talarico did not follow the statutory procedures contained in § 9.45 because he relied upon the report of Hamilton who is not a police or peace officer within the meaning of N.Y.CRIM.PRO. § 1.20(34)(b)[8] or §§ 1.20(33) and 2.10.[9]

Pursuant to § 9.45, a pick-up order may be issued upon a report from, among others, a police officer. A "police officer" is defined to include "Sheriffs, under-sheriffs and deputy sheriffs of counties outside of New York City." N.Y.CRIM.PRO. 1.20(34)(b). According to former Sheriff Paul Peterson, Hamilton holds a competitive, permanent position and is authorized to act as a police officer. Hamilton also asserts that he is authorized to act as a deputy sheriff and, thus, is a police officer within the meaning of N.Y.CRIM.PRO. 1.20(34)(b).

The evidence demonstrates that Hamilton was a part-time or special Deputy Sheriff appointed by the Delaware County Sheriff's Department. Special or part-time deputy sheriffs are empowered to perform "only those duties and powers authorized by such sheriff." N.Y. COUNTY LAW §§ 653; *see also* N.Y. COUNTY LAW §§ 652(2), 655; *People v. Terwilliger*, 172 Misc. 70, 14 N.Y.S.2d 267 (City Court 1939); *People v. Smith*, 105 Misc.2d 586,

---

8. That provision provides that "[t]he following persons are police officers .... (b) Sheriffs, under-sheriffs and deputy sheriffs of counties outside of New York City."

9. Section 1.20(33) defines "peace officer" as those persons listed in § 2.10. Section 2.10 contains a lengthy list of individuals who qualify as "peace officers". Hamilton does not claim to be a peace officer and, thus, the Court will not reprint § 2.10 here.

587, 432 N.Y.S.2d 612 (Sup Ct.1980). The defendants have not provided adequate evidence establishing the extent of Hamilton's authority as a special deputy sheriff. Thus, there is insufficient evidence before the Court to determine whether, at the times in question, he was acting within the scope of any such authority.

Assuming, without deciding, that Hamilton was not a police or peace officer as defined by N.Y.CRIM.PRO. 1.20(34), it was objectively reasonable for Talarico to believe that Hamilton was a police officer and, thus, that he was not violating Hoffman's constitutional rights. *See Connell v. Signoracci*, 153 F.3d 74, 80 (2d Cir.1998). Hamilton advised Hoffman that he was acting pursuant to N.Y. MENTAL HYG.LAW § 9.41, which applies only to police and peace officers. The pick-up order and Talarico's deposition testimony demonstrate that he believed that Hamilton was a police officer with the County Sheriff's Department. Based upon the evidence then available, reasonable persons could disagree whether Hamilton was a police officer authorized to make a report pursuant to N.Y. MENTAL HYG.LAW § 9.45. Accordingly, Talarico is entitled to qualified immunity.

As previously noted, Hoffman's claims that Hamilton or Blot never provided Talarico with the information supporting the pick-up order is without merit. Defendants have submitted substantial evidence demonstrating that Blot and Hamilton relayed their concerns regarding Hoffman to Talarico. Thus, Talarico is entitled to qualified immunity on both the Fourth and Fourteenth Amendment claims.

**2. Whitten**

Hoffman claims that Whitten provided false or misleading information to Talarico and that Talarico utilized this false or misleading information in issuing the pick-up order. Whitten responds that he merely provided truthful answers in response to inquiries by Hamilton and Masters and that he took no part in ob-

taining the pick-up order. Assuming Hoffman suffered a constitutional injury, Whitten may not be held liable therefor.

Although Whitten is the commissioner of police and provided information to various individuals, there is no evidence that Whitten confined or intended to confine plaintiff, or affirmatively procured or instigated Hoffman's arrest. *See King v. Crossland Savings Bank*, 111 F.3d 251, 256 (2d Cir. 1997). Further, Whitten took no part in the decision to seek or issue the pick-up order or to admit Hoffman to the hospital. Rather, Whitten merely responded to inquiries by Hamilton and Masters. Thus, it cannot be said that Whitten sufficiently contributed to any alleged Constitutional injury sufficient to support a claim pursuant to 42 U.S.C. § 1983. *See Taylor v. Brentwood Union Free Sch. Dist.*, 143 F.3d 679, 685 (2d Cir.1998) (stating that a § 1983 plaintiff must prove, inter alia, that the defendant caused the deprivation of his or her rights) (citing *Monell v. Department of Social Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 2036–37, 56 L.Ed.2d 611 (1978)), *cert. denied,* — U.S. —, 119 S.Ct. 1027, 143 L.Ed.2d 37 (1999).

Whitten also is entitled to the defense of qualified immunity. The evidence demonstrates that Whitten acted in good faith and that the information provided by Whitten is consistent with that obtained from Blot, Hamilton and Bowie. Hoffman has presented no evidence tending to support his allegation that Whitten provided false or misleading information to Hamilton or Masters.

**3. Moon**

Moon also is entitled to summary judgment because there is no evidence demonstrating that Moon in any way caused or contributed to a deprivation of Hoffman's Constitutional rights. *See Taylor,* 143 F.3d at 685. Even assuming a constitutional violation caused by Moon, his actions are protected by qualified immunity.

Moon's involvement was limited. Moon conferred with Hamilton and advised that further investigation into Hoffman's mental heath was advisable. At the conclusion of Hamilton's investigation, Moon determined that Hoffman posed a substantial risk of harm to others for which hospitalization was necessary. Accordingly, Moon applied for an involuntary admission pursuant to N.Y. MENTAL HYG.LAW § 9.27.[10] As required by § 9.27, the application contained a statement of the facts upon which the allegation of mental illness and need for care and treatment was based. The application stated that:

> Hoffman has refused to seek therapy or voluntary psychiatric consult and he has become consumed by his anger and paranoia directed at the Village of Sidney it's present and past police commissioners.... It is our information that Mr. Hoffman has amassed a large quantity of firearms in his small apartment ... and he has told other officers that he sandbags in the floor and walls of this apartment to prevent any assault on the apartment. Mr. Hoffman would not permit Deputy Mark Hamilton and Deputy Jeff Bowie to interview him in his apartment.... Mr. Hoffman believes that people are trying or may try to break into his apartment. Mr. Hoffman believes that the former Police Commissioner, Charles Bessett who lives in South Carolina wants to break into his apartment. Mr. Hoffman believes that a conspiracy that started in 1987 is the root of all his problems with his present employer and that he seems to be consumed by anger and paranoia directed at Craig Whitten, Robert Davis and Rick Charles.

Moon, the County Commissioner of Social Services, was authorized to make an application pursuant to § 9.27, *see* N.Y. MENTAL HYG.LAW § 9.27(b)(5) (social services official may apply for involuntary admission); N.Y.SOC.SERV.LAW § 2(14) (commissioner of social services is a "social services official"), and his conduct otherwise fully comported with § 9.27. *See e.g. Matter of Stefano,* 140 Misc.2d 801, 803, 531 N.Y.S.2d 212 (Sup.Ct.1988). Of course, Hoffman was *not* admitted pursuant to Moon's § 9.27 application[11], but pursuant to § 9.39 after a § 9.45 pick-up order had been issued by Talarico. Thus, Moon's actions did not sufficiently contribute to Hoffman's involuntary confinement sufficient to support a § 1983 claim.

Assuming a Constitutional harm and sufficient causal connection, Moon reasonably concluded based upon the evidence then available that Hoffman was dangerous and, thus, applied for an involuntary admission. A reasonable belief that Hoffman was dangerous was a sufficient basis upon which to seek such an application. *See Prevost,* 722 F.2d at 973; discussion *supra* at II(D)(1). The information known to Moon at the time objectively demonstrates a sufficient basis upon which to obtain a pick-up order and/or seek admission to a hospital pursuant to N.Y. MENTAL HYG.LAW § 9.27 and, accordingly, Moon's actions are protected by qualified immunity. Hoffman has presented no evidence that Moon acted in bad faith or provided false or misleading information in support of the § 9.27 application or the pick-up order.

**4. Hamilton**

 Hamilton moves for summary judgment claiming that his actions were

---

**10.** Section 9.27 (Involuntary Admission on Medical Certification) permits a hospital to "receive and retain ... any person alleged to be mentally ill and in need of involuntary care and treatment upon the certificates of two examining physicians, accompanied by an application for the admission of such person.... Such application ... may be executed by ... (5) the director of community ser- vices or social services official, as defined in the social services law, of the city or county in which any such person may be."

**11.** There is no evidence before the Court that the § 9.27 application was certified by two physicians as required by the statute.

objectively reasonable and, thus, he is entitled to qualified immunity. Hoffman responds that Hamilton violated a clearly established Constitutional right because Hamilton did not have probable cause to seek a pick-up order and Hamilton provided false and misleading information in support of the pick-up order. Hoffman further argues that Hamilton is not a police or peace officer and, therefore, improperly sought a pick-up order pursuant to § 9.45.

Hamilton had probable cause to believe that Hoffman posed a substantial risk of harm to others sufficient to seek a pickup order. Upon a report from Blot regarding Hoffman's threats to various individuals, Hamilton consulted with his superior, Moon, and County Psychiatrist Talarico. Upon the advice of Moon and Talarico, Hamilton interviewed Hoffman to evaluate his mental condition. During the interview, Hamilton allegedly advised Hoffman that he was acting in his capacity as the Director of the Special Investigations Unit of the Department of Social Services to make an assessment under N.Y.Soc.Serv. Law § 473 (Adult Protective Services) and N.Y. Mental Hyg.Law § 9.41 (Emergency admissions for immediate observation, care, and treatment; powers of certain peace officers and police officers).[12] Hamilton became genuinely concerned that Hoffman posed a substantial threat of danger to various current and former Village officials. Thus, Hamilton relayed his concerns to Talarico, who issued the pick-up order. Reasonable officers could disagree whether Hoffman was sufficiently "dangerous" to warrant an application for a pick-up order. Further, there is no evidence that Hamilton supplied materially false or misleading information in support of the pick-up order. Thus, Hamilton had a proper basis upon which to seek a pick-up order.

Hoffman's remaining contention, that Hamilton was not a police officer authorized to seek a pick-up order or to take Hoffman into custody in response to the pick-up order, is more troubling. As previously discussed, there is insufficient evidence before the Court to determine whether Hoffman was a police officer and whether, at the times in question, he was acting in such a capacity.

On the one hand, there is no indication in the record that Hamilton intentionally misrepresented to Talarico his authority to seek the pick-up order and take Hoffman into custody. *See e.g. Velardi v. Walsh*, 40 F.3d 569, 573 (2d Cir.1994) ("Where an officer knows, or has reason to know, that he has materially misled a magistrate on the basis for a finding of probable cause, ... the shield of qualified immunity is lost.") (quoting *Golino v. City of New Haven*, 950 F.2d 864, 871 (2d Cir.1991), *cert. denied*, 505 U.S. 1221, 112 S.Ct. 3032, 120 L.Ed.2d 902 (1992)). On the other hand, Hamilton is, or should be, particularly aware of his authority as a special or part-time deputy sheriff. If Hamilton knew, or reasonably should have known, that he did not have the authority to seek a pick-up order then he may be held liable for violating Hoffman's constitutional rights. *See id.* Similarly, Hamilton's authority as a special or part-time deputy sheriff is crucial to a determination of whether he was authorized to take Hoffman into custody pursuant to the pick-up order and transport him to the hospital, *see* N.Y. Mental Hyg.Law § 9.45, thereby implicating Fourth Amendment rights. Thus, Hamilton's status and authority as a special or part-time deputy sheriff is an outstanding factual issue that precludes the entry of summary judgment in his favor. If it is determined at trial that Hamilton was authorized to act as a police officer, to seek a pick-up order, and to take Hoffman into custody and transport him to the hospital pursuant to the pick-up order, then Hamilton's actions were reasonable under the circumstances and he would be entitled to qualified immunity.

12. The substance of the interview has been set forth above and need not be restated here.

Finally, none of the defendants herein took part in the decision to admit and/or retain Hoffman at the hospital and, thus, they cannot be held accountable therefor. Rather, Hoffman was afforded all the procedural protections set forth in Article 9 of Mental Hygiene Law.

### E. Fourth Amendment Claim

■ Hoffman also asserts a violation of the Fourth Amendment claiming that Hamilton entered his apartment and seized his handguns without a search warrant or consent. Hamilton moves to dismiss claiming that Hoffman gave consent to Officer Lewis and that this consent was sufficient to permit Hamilton to also enter the apartment.

Consent is a well-established exception to the probable cause and warrant requirements of the Fourth Amendment. *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 2058, 36 L.Ed.2d 854 (1973); *United States v. Peterson,* 100 F.3d 7, 11 (1996). "The Fourth Amendment is satisfied when, under the circumstances, it is objectively reasonable for the officer to believe that the scope of the suspect's consent permitted him to [conduct the search that was undertaken]." *Florida v. Jimeno,* 500 U.S. 248, 111 S.Ct. 1801, 1803, 114 L.Ed.2d 297 (1991).

Here, Hoffman admits that he consented to have his friend, Officer Lewis, enter his apartment, obtain his firearms, and turn them over to the County Sheriff. Hoffman also admits that he never told Lewis that other officers, including Hamilton, were not to enter his apartment. However, Hoffman claims that he expressly told Hamilton that he was not authorized to enter the apartment without a warrant. The evidence demonstrates that Lewis was present during the search of Hoffman's apartment. In fact, Lewis, Tiska, Blot, and Hamilton all entered Hoffman's apartment. The handguns were retrieved and inventoried by Officer Lewis.

While Hoffman was permitted to "delimit as he chooses the scope of the search to

which he consent[ed]", *Jimeno,* 111 S.Ct. at 1804, a consent may not be qualified by the number of officers allowed to search. *See United States v. Rubio,* 727 F.2d 786, 797–97 (9th Cir.1983); *United States v. Betts,* 16 F.3d 748, 755 (7th Cir.1994); *State v. Benallie,* 570 N.W.2d 236 (S.D. 1997); *see also Wildauer v. Frederick County,* 993 F.2d 369, 372 (4th Cir.1993). As the Ninth Circuit stated in *Rubio:*

> We are unpersuaded that a consent search may be validly qualified by the number of officers allowed to search, and we so hold. Once consent has been obtained from one with authority to give it, any expectation of privacy has been lost. We seriously doubt that the entry of additional officers would further diminish the consenter's expectation of privacy.

*Rubio,* 727 F.2d at 797.

Thus, having given consent to Lewis, Hoffman no longer had any expectation of privacy and, accordingly, suffered no violation of his Fourth Amendment rights. *See id.*

The fact that Hamilton was a member of a different police department than Lewis or was acting in his position as Special Investigator for the County Department of Social Services Lewis does not require a different result. For example, *Rubio* involved "a group of local, state and federal officers." *Id.* at 796. The Ninth Circuit did not find the involvement of federal, state, and local police agencies to be determinative of the defendant's expectation of privacy. Similarly, in *Wildauer,* the plaintiff consented only to the entry of an employee of the department of social services into her home. Nevertheless, members of the sheriff's department, who had accompanied the social worker to the plaintiff's home, also entered. The Fourth Circuit, in agreeing with the Ninth Circuit, stated that "once a person consents to the search ... he may not qualify the number of officials allowed to search. Having consented to [the social worker's] entry, [plaintiff] could not deny access to other

members of the party." *Wildauer*, 993 F.2d at 372. Here, Hoffman knew that Hamilton, the Department of Social Services, and the County Sheriff were involved in his case. Thus, having given consent to Officer Lewis to enter his residence, he no longer had any expectation of privacy and could not limit that consent to exclude Hamilton.

■ Similarly, whether Hoffman specifically told Hamilton not to enter the apartment without a warrant does not alter the Court's conclusion. The only case to arguably support Hoffman's position is *Mickelson v. State*, 906 P.2d 1020 (Wyo. 1995). In *Mickelson*, the police obtained consent upon their promise that only one officer would enter the premises. Mickelson gave his consent upon the express condition that only that one officer enter the premises. Notwithstanding this promise, another officer entered the premises. The Mickelson court disagreed with the above-cited federal cases and held that an individual could limit consent to a certain number of officers. *Mickelson*, 906 P.2d at 1022–23.

■ *Mickelson* is distinguishable from the instant case because, here, Hoffman's consent was not induced upon a promise that only one officer would enter the apartment. Rather, Hoffman consented to have Lewis enter his apartment and retrieve

the handguns. Lewis did enter the apartment, although other individuals, including Hamilton, accompanied him. Again, Hamilton gave his consent with full knowledge that the Sheriff's Department and the Department of Social Services were involved in his case and, therefore, he could not reasonably have expected that they would not be present when his handguns were retrieved from his apartment. This is supported by the fact that the order suspending Hoffman's license to carry and possess and handgun required him to turn his guns over to the County Sheriff. *See Rubio*, 727 F.2d at 797; *Betts*, 16 F.3d at 755; *Wildauer*, 993 F.2d at 372; *see also United States v. White*, 617 F.2d 1131, 1134 (5th Cir.1980) (defendant suffered no harm as a result of search by officers other than those listed on the consent form). To the extent that *Mickelson* stands for a broader proposition, its holding is not binding and the Court declines to follow it.[13]

### F. Municipal Liability

A municipality may not be held liable under § 1983 on a theory of *respondeat superior*. *Thomas v. Roach*, 165 F.3d 137, 145 (2d Cir.1999). Thus, to the extent that Hoffman seeks to hold the Village liable under such a theory, those claims must be dismissed.

**13.** Assuming Hoffman suffered a constitutional violation, he would be entitled to qualified immunity. " '[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the objective legal reasonableness of the action assessed in light of the legal rules that were clearly established at the time it was taken.' " *Lewis*, 165 F.3d at 166 (quoting *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 3036, 97 L.Ed.2d 523 (1987)). "In order to conclude that the right which the official allegedly violated is 'clearly established,' the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 107 S.Ct. at 3036–37. Here, Hamilton is entitled to qualified immunity because although one's right to be free from unreasonable searches is a well-settled right, the state of the law regarding an

individual's ability to limit consent to exclude particular individuals was not settled in New York State or in the Second Circuit. *See Anderson*, 107 S.Ct. at 3037. The prevailing law at the time, and currently, was that a person may not validly restrict consent to limit the number of officers allowed to enter the premises. *See Rubio*, 727 F.2d 786; *Betts*, 16 F.3d 748; *Wildauer*, 993 F.2d 369; *State v. Benallie*, 570 N.W.2d 236 (S.D.1997) (stating that "[t]here is no requirement that consent be given to every investigating officer before they are allowed to search ... [and] a consent search cannot be qualified by the number of officers allowed to search."). Thus, once Hoffman had given consent to Lewis, it was reasonable for Hamilton to conclude that Hoffman no longer had a privacy expectation and that his accompanying Lewis into Hoffman's apartment would not violate his Fourth Amendment rights.

■ On the other hand, "municipal liability under § 1983 may be premised upon an officially promulgated policy; a custom or persistent practice; deliberately indifferent training that is the proximate cause of the violation of plaintiff's federally protected rights; or a single decision by an official with final decision-making authority." SECTION 1983 LITIGATION, CLAIMS AND DEFENSES, 3D ED., Martin A. Schwartz and John E. Kirklin, Vol. 1, § 7.6, p. 21 (citations omitted); *see Roach,* 165 F.3d at 145; *DeCarlo v. Fry,* 141 F.3d 56, 61 (2d Cir. 1998).

Hoffman's Complaint fails to allege Constitutional harm as a result of officially promulgated custom or persistent practice or negligent supervision. Neither the Complaint nor any of Hoffman's submissions make reference to official customs or policies or negligent supervision. Further, "a single incident alleged in a complaint ... does not suffice to establish a municipal policy." *DeCarlo,* 141 F.3d at 61 (quoting *Ricciuti v. New York City Transit Auth.,* 941 F.2d 119, 123 (2d Cir.1991)).

Hoffman does, however, seem to allege deliberate indifference. For example, the Complaint repeatedly alleges that various actions taken by County officials "were condoned and supported by the Legislative and policy making officers of the County of Delaware." Hoffman has failed, however, to proffer any facts or evidence tending to support his conclusory claims of deliberate indifference. There is no indication that this is a repeat occurrence or that the County was aware, or reasonably should have been aware, of any Constitutional injuries being inflicted by its employees and failed to take adequate remedial action. *See DeCarlo,* 141 F.3d at 61. In fact, Hoffman did not even address the issue of municipal liability in his opposition to the County's motion for summary judgment. Accordingly, the claims against the County of Delaware must be dismissed.

### G. State Law Claims

Having dismissed all federal claims against Whitten, Moon, Talarico, and the County of Delaware, there remains no independent basis for exercising federal jurisdiction over those defendants and, accordingly, the pendent state law claims against them must be dismissed. *See* 28 U.S.C. § 1367(c)(3); *Castellano v. Board of Trustees of Police Officers' Variable Supplements Fund,* 937 F.2d 752, 758 (2d Cir.1991), *cert. denied,* 502 U.S. 941, 112 S.Ct. 378, 116 L.Ed.2d 329 (1991).

■ That leaves only the state law claims against Hamilton. Hamilton argues that the intentional tort claims are barred by the one year statute of limitations found at N.Y.C.P.L.R. § 215. Under New York law, false arrest and false imprisonment claims accrue on the date of the release from confinement. *Ragland v. New York City Housing Auth.,* 201 A.D.2d 7, 9, 613 N.Y.S.2d 937 (2d Dep't 1994) (accrual of false imprisonment); *Jackson v. Police Dept. of City of New York,* 119 A.D.2d 551, 552, 500 N.Y.S.2d 553 (2d Dep't 1986) (same); *Redding v. County of Westchester,* 59 A.D.2d 776, 398 N.Y.S.2d 732 (2d Dep't 1977) (accrual of false arrest). Here, Hoffman was released from the hospital on July 23, 1996 and the instant lawsuit was commenced on July 15, 1997, less than one year from the date of release from confinement. Thus, those actions are timely. As discussed above, questions of fact remain regarding Hamilton's status as a police officer and his authority to detain Hoffman. Thus, the Court cannot now say as a matter of law that Hamilton's actions are privileged or that he is entitled to immunity protection. *See Curley v. AMR Corp.,* 153 F.3d 5, 13 (2d Cir.1998).

■ With respect to Hoffman's claim for the intentional infliction of emotional distress, it could reasonably be argued that any alleged outrageous conduct continued until the date of Hoffman's release from the hospital and, thus, that claim also is timely. *See Yokley v. Henry–Clark Assocs.,* 170 Misc.2d 779, 781, 655 N.Y.S.2d 714 (2d Dep't 1996).

Turning to the merits of Hoffman's claim against Hamilton for the intentional infliction of emotional distress, however, such claim must be dismissed. A claim for intentional infliction of emotional distress requires a showing of (1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress. *See Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir.1999) (citing *Howell v. New York Post Co.*, 81 N.Y.2d 115, 122, 596 N.Y.S.2d 350, 612 N.E.2d 699 (1993)). On a motion for summary judgment, "[w]hether the conduct alleged may reasonably be regarded as so extreme and outrageous as to permit recovery is a matter for the court to determine." *Id.* There is no evidence in the present matter demonstrating that Hamilton intentionally or recklessly engaged in conduct that was so extreme and outrageous as to transcend the bounds of decency and that would be regarded as atrocious and utterly intolerable in a civilized society. *See id.* at 828–829.

### III. CONCLUSION

For the foregoing reasons, the motions by Defendants County of Delaware, Talarico, Moon and Whitten are GRANTED and the Complaint is DISMISSED as to those defendants in its entirety. Defendant Hamilton's motion for summary judgment is GRANTED IN PART and the causes of action against him asserting violations of the First Amendment and the intentional infliction of emotional distress are DISMISSED. In all other respects, Hamilton's motion for summary judgment is DENIED.

**IT IS SO ORDERED**